407 F.2d 73
 32 A.L.R.3d 846
 Emile POWE, Eileen Hickey, Mark Rosenthal, Ellen Winters,
Lynn Felsher, Glenca Smith, Deborah Kaplan,
Plaintiffs-Appellants,
v.
Leland MILES, as President of Alfred University, and Alfred
University, Defendants-Appellees.
 No. 217, Docket 32833.
 United States Court of Appeals Second Circuit.
 Argued Nov. 14, 1968.
Decided Dec. 23, 1968.
 
 Joshua N. Koplovitz and Koplovitz & Fabricant, New York City (Jacob D. Hyman, David G. Jay, Buffalo, N.Y., of counsel), for plaintiffs-appellants.
 John B. McCrory, Rochester, N.Y., Nixon, Hargrave, Devans & Doyle, Rochester, N.Y., C. Everett Shults, Hornell, N.Y., for defendants-respondents.
 Before MEDINA, FRIENDLY and SMITH, Circuit Judges.
 FRIENDLY, Circuit Judge:
 
 
 1
 This appeal from the dismissal of a complaint under the Civil Rights Act, 42 U.S.C. 1983, by students at Alfred University, some of them in the New York State College of Ceramics, demands analysis of the elusive concept of 'state action,' recently characterized as 'the most important problem in American law.' Black, 'State Action,' Equal Protection, and California's Proposition 14, 81 Harv.L.Rev. 69 (1967). It requires us to consider this in the context not of racial discrimination, to which Rofessor Black limited his discussion, id., at 70, but of First Amendment rights. Our labors have at least convinced us of the wisdom of Mr. Justice Clark's observation in Burton v. Wilmington Parking Authority, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961), criticized at the time for failing to provide adequate guidance:[1]
 
 
 2
 'Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance.'
 
 I.
 
 3
 Alfred University began in 1836 as a 'select school,' which developed into Alfred Academy, chartered in 1843. The Academy was incorporated as a private university by the New York Legislature in 1857. Its charter provides for government by a board of 33 self-perpetuating trustees. All are private individuals. It now has four colleges, the Liberal Arts College, the Graduate School, the School of Nursing, and the New York State College of Ceramics. The last stems from a state school of clay-working and ceramics which New York founded at Alfred in 1900. N.Y.Laws, c. 383. When New York established a State University in 1948, it provided that the University should include not only state-operated institutions but also 'statutory or contract colleges' like that at Alfred, to wit, 'Colleges furnishing higher education, operated by private institutions on behalf of the state prusuant to statute or contractual agreements.' Education Law McKinney's Consol. Laws, c. 16, 350(3) & 352(3).[2] At the same time the Legislature directed that, subject to higher state authority, 'the state university trustees shall be responsible for: (a) The over-all central administration, supervision and co-ordination of state-operated institutions and statutory or contract colleges in the state university,' Education Law 355(1), and also added what is now 357 of the Education Law providing that:
 
 
 4
 'Statutory or contract colleges shall continue to be operated pursuant to the provisions of this chapter (the 1948 Act) but such colleges shall be subject to the general supervision and control of the state university trustees.'
 
 
 5
 In 1950 the provisions of the Education Law dealing specifically with the New York State College of Ceramics were recast in light of the establishment of the State University; we set them forth in the margin.[3]
 
 
 6
 Although the record does not contain the contract between the State and Alfred University with respect to the Ceramics College, the testimony of President Miles furnishes many significant details. The State pays all the direct expenses of the College (sometimes hereafter CC). In addition it pays a stipulated sum per credit hour for courses taken by CC students in 'the private sector,' with a corresponding payment by the latter for instruction CC gives students in other colleges. The State reimburses Alfred for a pro rata share of the entire administrative expense of the University including the salaries of the President, the Dean of Students, and other general officers, utilities and overhead.
 
 
 7
 The dean and faculty of CC are hired and gain tenure in the same way as the dean and faculty of other colleges at Alfred. On retirement they can opt between the state retirement plan and the Alfred plan but in fact all take the latter. While 355-a(1) of the Education Law generally authorizes the state university trustees to classify and allocate all professional employees of the state university, it excepts 'those of the New York state colleges * * * administered by Cornell university and Alfred university,' which are authorized, subject to state approval, to allocate professional and other employees at their contract colleges, 355-a(2). The two universities are to classify each professional or non-professional employee of the contract colleges within two grade schedules laid down in the statute. Maximum and minimum salaries, and a maximum annual increment, are specified for each grade, 355-a(3). Further detailed provisions govern other aspects of the remuneration of all state university employees, regulating identically the contract colleges and the state-operated institutions, 355-a(4) to(11).
 
 
 8
 The state's last annual appropriation for CC was $1,800,000. This was 20.75% Of the total Alfred budget. There are some 550 students and 40 faculty members in CC, as compared with University totals of 1800 and 140. As indicated, CC students take some courses in the Liberal Arts College; indeed this is an important reason for having CC at Alfred. The reverse is true in lesser degree.
 
 II.
 
 9
 In recent years students at Alfred, like those at many other universities, have engaged in protests and demonstrations, sparked in particular by opposition to the war in Vietnam and commitment to improving relations between black and white citizens. Fully recognizing the propriety of such action the University issued a Policy on Demonstrations effective January 1, 1968, which is reproduced as an Appendix to this opinion.
 
 
 10
 The events giving rise to this suit took place on May 11, 1968. We summarize them as follows:
 
 
 11
 Alfred has for several years sponsored an annual Parents Day, on which the parents of students are invited to visit the campus and attend various gatherings. Since the founding of an Army ROTC unit on campus in 1952, a military review has been scheduled as one of the Parents Day activities. Held on the university's football field, the review allows the parents to see the cadet corps in marching maneuvers and serves as the occasion for the presentation of awards to cadets who have excelled in the military science program. During the week prior to the 1968 Parents Day on Saturday, May 11, several Alfred students, members of the SDS chapter on campus, met to discuss the possibility of staging a demonstration during the ceremonies. They considered the event an appropriate occasion for demonstration because there had recently been controversy over the requirement that each male student at Alfred participate in the ROTC program during his freshman and sophomore years and the assembly of parents would furnish a large audience to witness the expression of views. The students did not confer with the Dean of Students about their plan to demonstrate or give his office the 48-hour prior notice required by the Policy on Demonstrations. There was testimony that two of the students attempted unsuccessfully to meet with President Miles during that week, but apparently the President was informed only that this related to 'the matter of compulsory ROTC on the campus' and not that it concerned a planned demonstration. By Thursday evening these students had argeed among themselves that they would demonstrate at the military review on Saturday. When they met Saturday morning, they were joined by several other students and one faculty member, their number totaling sixteen.
 
 
 12
 Just before the ROTC ceremony was scheduled to begin on Saturday morning, several hundred parents and school officials had assembled in the grandstand at the football field. Four or five feet in front of the grandstand, straddling the 50-yard line, a reviewing stand had been erected in which military and other officials were to sit and review the cadets' march. To one side of this stand was a small table bearing trophies and awards to be presented to honored cadets. On the field itself red flags marked out the line of march that would be taken by the 500 cadets participating in the program.
 
 
 13
 After the stands had filled, the 'adjutant's call' was sounded and the band began to march onto the field. The sixteen demonstrators entered from the end, walking single-file down the sideline four feet in front of the reviewing stand between the stand and the cadets then assembling on the field. Carrying signs that advocated scholarships for black students, the teaching of Negro history, an end to compulsory ROTC, and peace in Vietnam, the demonstrators marched once or twice down the sideline and then came to rest directly before the stands facing the audience and holding their signs for maximum visibility. Shouts were exchanged between the demonstrators and the spectators; the plaintiffs testified that their presence was greeted with boos and hisses from parts of the grandstand and clapping from other parts. At no time, however, did the onlookers indicate an intention to interfere physically with the demonstration. About five minutes after the demonstrators entered the field, when the Dean of Students concluded that they intended to remain indefinitely where they were, he announced by microphone from the press box at the top of the grandstand that their actions were in violation of the demonstration guidelines and requested them to 'conform' by 'removing' themselves from the field. Eight of the student demonstrators obeyed this announcement by moving past the end of the grandstand, where they sat on the sidelines with their signs for the remainder of the event; seven students and the faculty member stayed where they were. The Dean repeated his request four times, twice to the students and twice to the faculty member. He then declared those disobeying his order to be 'provisionally suspended' from the university, and informed them that they could pick up the charges against them at his office that afternoon and that a hearing would be held the following morning. The eight persisting demonstrators remained in their places, seating themselves for a few moments but rising again at the playing of the Star Spangled Banner that began the presentation of awards. A second faculty member joined them, and they remained standing before the reviewing stand for the duration of the ROTC parade, about 45 minutes, holding their signs at chest level and occasionally raising them above their heads. The demonstrators were thus a direct obstacle to the vision of those in the reviewing stand and in the lower tiers of the grandstand.
 
 
 14
 As the ranks of cadets marched onto the field Colonel Schumacher, head of the ROTC unit, directed the cadet leader, 'you will have to shorten your line of march and do not go near the demonstrators.' Because of the interposition of the demonstrators between the marching cadets and the stands, certain elements of the procession were altered. The occupants of the reviewing stand cut short their 'trooping of the line,' in which they were to descend and walk past all of the six companies of cadets; and the brigade commander did not 'present the brigade to the reviewing officer' because when the time came for this 'all he could see was the demonstrators who were interposed between himself and the reviewing stand.'
 
 
 15
 The heart of the ceremony was to be the presentation of awards to 18 cadets for their performance in the ROTC program. These cadets detached themselves from their positions among the ranks on the field and assembled six abreast, 22 feet from the reviewing stand. As the program had been planned and rehearsed, the officers and honored guests were to descend one by one from the stand, approach the cadets, and present each award to its designated recipient, then return to the stand. These plans, of course, did not contemplate the presence of a line of demonstrators immediately between the stand and the cadets. Colonel Schumacher testified that 'when I saw the location of the demonstrators and I couldn't get the people to present the awards through them I decided my best plan would be to move the trophy table so that it would be on the other side closer to the people to receive the awards so that they would not have to walk through and I could escort the people making the presentations around the demonstrators.' The colonel and another officer went to the table and attempted to carry it through 'an open space' in the line of demonstrators; in their passage they contacted one or two of the students but 'pushed right on through.' Thereafter as each of the officials descended to present an award, he was led by the colonel around the line of demonstrators. One person scheduled to present an award 'backed off when he saw the demonstrators,' and left instead of making the presentation, apparently because 'his health wouldn't stand the excitement.' The colonel testified that the protesting students at this time were within the line of march delineated by the red flags. For the climax of the ceremony the whole body of cadets passed in review, marching by the reviewing stand on their way off the field. This was accomplished without physical contact with the demonstrators, but the band, marching in a wider formation than the cadets, had to alter its lines and still came near a collision. The 18 award recipients stood beside the stand to review the march; as part of the honor paid these cadets, the marchers were to turn 'eyes right' as they passed, giving a visual salute, but this ran afoul of the intervening presence of the members of the protest group. No attempt was made to accost the demonstrators at the end of the event, nor was there any interference with their leaving the field.
 
 
 16
 The hearing for the seven students before the faculty-student review board was adjourned to May 20 at their request; when it resumed, they were represented by counsel. The board recommended to President Miles that the students 'be separated forthwith from the University.' The President modified this by suspending them for the remainder of the semester and for the first semester of 1968-69, with leave to apply for readmission in January 1969. He made arrangements to allow them to take final examinations off campus and receive credit for the courses then being taken.
 
 III.
 
 17
 The seven students thus suspended brought this action late in August, 1968, in the District Court for the Western District of New York. Four are students at the Liberal Arts College, three at the New York State College of Ceramics. Alleging violation of the Civil Rights Act, 42 U.S.C. 1983, they invoked the court's jurisdiction under 28 U.S.C. 1343(3) and sought temporary and final injunctions compelling Alfred to reinstate them for the fall semester and preventing it from imposing penalties on students for exercising their right of free speech, a judgment declaring the Policy on Demonstrations to be void, and damages. The action was tried by Judge Curtin as on final hearing, F.R.Civ.P. 65(a)(2), with commendable despatch. He concluded, in a thoroughly reasoned opinion, that plaintiffs had failed to show action 'under color of any State law, statute, ordinance, regulation, custom or usage' as required by 28 U.S.C. 1343(3), and dismissed the complaint for want of federal jurisdiction. We expedited the appeal.[4]
 
 
 18
 Appellants' primary position is that there was state action in the suspension of all seven students; the defendants deny there was such action in any. Not being imprisoned by this formulation of the issue, we shall first consider the situation of the liberal arts students. If we should find state action with respect to them, the case of the CC students would be a fortiori; if we do not, the status of the latter must be separately examined.
 
 IV.
 
 19
 We perceive no sufficient basis for holding that the University's action with respect to the liberal arts students comes within the district court's jurisdiction to enforce the Civil Rights Act. To be sure, on a strictly literal basis, whatever Alfred University does is 'under color of' the New York statute incorporating it. But this is also true of every corporation chartered under a special or even a general incorporation statute, and not even those taking the most extreme view of the concept have ever asserted that state action goes that far. Appellants' claims are rather that Alfred performs a 'bublic function,' that it is subject to state regulation in many respects, that it receives government aid in addition to the support of CC, and finally that the interrelations between CC, and the rest of the University are so intimate as to deprive the latter of the private character it might otherwise have.
 
 
 20
 Appellants' 'public function' argument seeks to fuse a number of lines of authority, none of which is applicable here. One is typified by Marsh v. Alabama, 326 U.S. 501, 502, 508, 66 S.Ct. 276, 277, 90 L.Ed. 265 (1946), where a private company owned and operated an aggregation having 'all the characteristics of any other American town,' with its streets and public places generally open to all comers, and the private ownership was disregarded. While the principle of that decision has recently been held to cover the public walkways and parking areas of a privately owned shopping center, Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc., 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968), in the context of union picketing of one of the enterprises located there, this rested on findings that the premises resembled 'the business area of a municipality' and, in light of the tremendous development of suburban shopping centers, were 'the functional equivalent of a 'business block," and hence 'the State may not delegate the power, through the use of its trespass laws, wholly to exclude those members of the public wishing to exercise their First Amendment rights on the premises in a manner and for a purpose generally consonant with the use to which the property is actually put.' 391 U.S. at 315, 319, 88 S.Ct. at 1607, 1609. Alfred's football field does not fit the rubric of either Marsh or Logan Valley Plaza; it was open only to persons connected with the University or licensed by it to participate in or attend athletic contests or other events. In another variant the 'public function' cases concern particular activities or facilities so clearly governmental in nature that the state cannot be permitted to escape responsibility by allowing them to be managed by a supposedly private agency. The party primaries in Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944), and Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953), come within this category; so also does the once public park still 'swept, manicured, watered, patrolled, and maintained by the city as a public facility for whites only' in Evans v. Newton, 382 U.S. 296, 301, 86 S.Ct. 486, 489, 15 L.Ed.2d 373 (1966). Mr. Justice Douglas' opinion in the Evans case sharply distinguished, even in the context of racial discrimination, between a park, which 'is more like a fire department or police department that traditionally serves the community' and an educational institution, 382 U.S. at 302, 86 S.Ct. at 490. As to this, 'If a testator wanted to leave a school or center for the use of one race only and in no way implicated the State in the supervision, control, or management of that facility, we assume arguendo that no constitutional difficulty would be encountered,' 382 U.S. at 300, 86 S.Ct. at 489. Education has never been a state monopoly in this country, even at the primary or secondary levels, and New York's entry into higher education on a significant scale came more than a century after Alfred's establishment.[5]
 
 
 21
 The contention that New York's regulation of educational standards in private schools, colleges and universities, e.g., Education Law 207, 215, 305(2), makes their acts in curtailing protest and disciplining students the acts of the State is equally unpersuasive. It overlooks the essential point-- that the state must be involved not simply with some activity of the institution alleged to have inflicted injury upon a plaintiff but with the activity that caused the injury. Putting the point another way, the state action, not the private action, must be the subject of complaint. See Burton v. Wilmington Parking Authority, supra, 365 U.S. at 725, 81 S.Ct. 856, 6 L.Ed.2d 45; Grossner v. Trustees of Columbia University, 287 F.Supp. 535, 548 (S.D.N.Y.1968). When the state bans a subject from the curriculum of a private school, as in Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), its responsibility needs no elucidation. State action would be similarly present here with respect to all the students if New York had undertaken to set policy for the control of demonstrations in all private universities or in universities containing contract colleges. Cf. Public Utilities Comm'n of District of Columbia v. Pollak, 343 U.S. 451, 461-463, 72 S.Ct. 96 L.Ed. 1068 (1952).[6] But the fact that New York has exercised some regulatory powers over the standard of education offered by Alfred University does not implicate it generally in Alfred's policies toward demonstrations and discipline.
 
 
 22
 The amount of aid Alfred receives from the State other than for the Ceramics College is small. President Miles thought state and federal aid, excluding scholarships to students and the provision for CC, was only a hundred or two hundred thousand dollars a year, as against the total budget of $6.8 million. This is a long way from being so dominant as to afford basis for a contention that the state is merely utilizing private trustees to administer a state activity, as in Kerr v. Enoch Pratt Free Library of Baltimore City, 149 F.2d 212 (4 Cir. 1945). We perceive no basis for holding that the grant of scholarships and the financing of CC imposes on the State a duty to see that Alfred's overall policies with respect to demonstrations and discipline conform to First and Fourteenth Amendment standards so that state inaction might constitute an object of attack. Whether this would be true if Alfred were to adopt discriminatory admission policies, see Cooper v. Aaron, 358 U.S. 1, 19, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958), is a different question we need not here decide.
 
 
 23
 So far as concerns the liberal arts students, there remains only the argument based on the presence of the New York State College of Ceramics on the Alfred Campus. The contention has two additional facets. The first is that since the President and the Dean of Students allegedly act as agents of the State with respect to CC students-- a claim we will examine in the next section of this opinion-- they should be regarded as so acting with respect to all. Griffin v. Maryland, 378 U.S. 130, 84 S.Ct. 1770, 12 L.Ed.2d 754 (1964), is relied upon in this connection. But, in sharp contrast to the situation of the deputy sheriff in Griffin, there is no reason why the liberal arts students should regard the President and the Dean of Students as arms of the State in conduct concerning them. The othe facet is that if we should hold there was state action with respect to the CC students, it would be impracticable to have different rules for the two groups. Perhaps so, but that would be Alfred's problem. Whether or not it decided to establish the same policies for students outside CC as for those within it, its choice and the administration of the policies chosen for the former would be private action. We do not have at all a case where the wholly state-supported activity is so dominant that the private activity could be deemed to have been swallowed up.
 
 V.
 
 24
 The question whether the action of President Miles in establishing the guidelines and of the Dean of Students in enforcing them with respect to students in the New York State College of Ceramics constitutes state action is a rather close one. The argument against it begins with the assertion that what is decisive is the nature of the actor, not of those who are acted upon; we accept this as a good starting point, although only as that. The argument continues that here the actors were officers selected by the private board of trustees, paid in largest part by funds other than the state grant for CC, and bearing no outward indicia of state office. Moreover, the demonstration forbidden in this case occurred on private property, not in the state-provided buildings of the Ceramics College. Alfred relies also upon New York decisions holding, with respect to similar contract colleges at Cornell University, that the university cannot resist tort claims upon the basis of the State's sovereign immunity, Hamburger v. Cornell University, 184 App.Div. 403, 172 N.Y.S. 5 (3d Dept. 1918), aff'd 226 N.Y. 625, 123 N.E. 868 (1919), and that the State is not liable for the university's torts or breaches of contract, Green v. State of New York, 107 Misc. 557, 176 N.Y.S. 681 (Ct.Cl.1919); Effron v. State of New York, 208 Misc. 608, 144 N.Y.S.2d 656 (Ct.Cl.1953).
 
 
 25
 We find such decisions of little value. An agent is normally liable for his own torts and does not have his principal's immunity, see ALI, Restatement of Agency 2d 343, 347(1). If New York chooses not to consider itself liable in tort or contract for the acts of its contract colleges, that is its affair. The question whether it has so far involved itself in the operation of the New York State College of Ceramics that acts of its delegates constitute action 'under color of any State law, statute, ordinance, regulation, custom or usage' is a different one, whose resolution depends upon federal law. No one would question for a moment that the establishment of discriminatory admission policies for CC by the Alfred University trustees-- not simply against blacks but against Jews or redheads-- would constitute state action, although similar policies in the other colleges might not. Hammond v. University of Tampa, 344 F.2d 951 (5 Cir. 1965), so held on facts less commanding than here. As against this we recognize that discrimination may stand somewhat differently, because of the peculiar offensiveness of the state's taxing all citizens for objectives from the benefits of which a particular category is arbitrarily excluded or disadvantaged.
 
 
 26
 We hold that regulation of demonstrations by and discipline of the students in the New York State College of Ceramics at Alfred University by the President and the Dean of Students constitutes state action, for the seemingly simple but entirely sufficient reason that the State has willed it that way. The very name of the college identifies it as a state institution. In part I of this opinion we have extensively reviewed the statutes making the college an integral part of the State University;[7] it suffices here to cite Education Law 6102, whereby Alfred University maintains discipline and determines educational policies with respect to the State College 'as the representative of the state university trustees.' We see no reason why the State should not be taken at its word. The statutory provisions are not mere verbiage; they reflect the Legislature's belief that the citizens of New York would demand retention of State control over an educational institution wholly supported by State money. If the discipline had been administered by the Dean of CC, all of whose salary is paid by the State, because of Acts of CC students in the State-owned buildings, the existence of state action would hardly be doubted. We do not think a different result is justified because here the CC students were demonstrating on another part of the campus, which the State's payments on their behalf entitled them to enter for proper purposes, and the authority was exercised by delegates of the State who also have other roles. While even as to the CC students the President and the Dean of Students may lack the symbolic tie with the state furnished by the deputy sheriff's badge in Griffin v. Maryland, supra, or the public building in Burton v. Wilmington Parking Authority, supra, the students of the New York State College of Ceramics can properly regard themselves as receiving a public education[8] and entitled to be treated by those in charge in the same way as their counterparts in other portions of the State University. If the State wanted Alfred's policy on demonstrations changed for the CC students, mere order of the State University trustees would suffice, Education Law 355(1)(a), and(2)(b); no general legislation would be needed, as it would be if the State desired to control the policy for other students. However one characterizes Alfred's relationship to the State with respect to the New York State College of Ceramics, it is much closer than that of an independent contractor. The State furnishes the land, buildings and equipment; it meets and evidently expects to continue to meet the entire budget; it requires that all receipts be credited against that budget, Education Law 6102; and in the last analysis it can tell Alfred not simply what to do but how to do it. The confiding of certain duties to private individuals no more insulates the State under these circumstances than in Kerr v. Enoch Pratt Free Library, supra. While it may well be that the principle of Burton v. Wilmington Parking Authority would not require a finding of state action or, in any event, of unconstitutional state action if the coffee shop involved in that case dismissed a waitress without notice and hearing or refused to rent a private dining room to the local branch of the Communist Party, the State's relation to the New York State College of Ceramices goes far beyond that of landlord and tenant. The control of these student protests by the President and the Dean of Students on behalf of the State is an instance of positive state involvement, whether obvious or not.
 
 VI.
 
 27
 Our disagreement with the district judge's holding of absence of state action with respect to the three plaintiffs who were students at the New York State College of Ceramics does not lead automatically to partial reversal. It only forces us to consider the issue, not reached by him, whether they were deprived of 'any rights, privileges, or immunities secured by the Constitution and laws * * *.' 42 U.S.C. 1983. We hold they were not.
 
 
 28
 We need not deal at length with plaintiffs' argument that guideline (8) of the Policy on Demonstrations, which requires 48 hours advance notice, is an invalid prior restraint on the right of expression. The provision does not seem objectionable as applied to a demonstration, such as this one, that had been planned well in advance; such notice affords a desirable opportunity for the administration and the demonstrators to work out detailed methods for the conduct of the protest in a manner compatible with the legitimate interests of all. Cf. Cox v. New Hampshire, 312 U.S. 569, 574, 61 S.Ct. 762, 85 L.Ed. 1049 (1941). The guideline requires only that notice be given, not that approval be obtained. Contrast Hammond v. South Carolina State College, 4 Cir., 272 F.Supp. 947 (1967), where a regulation required that demonstrators obtain prior approval from the college president and furnished no standards to limit his discretion in denying approval. Nor is there any indication of bad faith on the part of Alfred, as in Robinson v. Coopwood, 292 F.Supp. 926 (N.D.Miss.1968), where it appeared that city officials, in enacting and enforcing an ordinance requiring one hour notice of mass assemblies, 'were motivated primarily by a desire to impede and halt all organized civil rights marches within the city limits.' We are not required to decide whether the First Amendment rights of the CC students would have been violated if the University sought to enforce this provision under circumstances where advance notice was not feasible, as, for example, in the case of the spontaneous demonstrations following the lamentable assassination of Dr. King. The University had made clear it would not insist on advance notice under such circumstances; indeed the Dean of Students testified that, on the basis of an earlier discussion between President Miles and some of the plaintiffs, he regarded the 48-hour provision as a dead letter entirely. Accordingly, students had disregarded the provision on several occasions prior to the present demonstration, and the suspensions in this case were not bottomed on a failure to furnish notice to the administration.
 
 
 29
 The thrust of plaintiffs' argument is rather that while the guidelines may be reasonable in their substantive requirements, the vesting in the Dean of Students of what plaintiffs consider an unreviewable authority to construe them constitutes an unreasonable prior restraint under Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). The Court there considered a statute allowing a state court, after a determination that the defendant had recently published 'malicious, scandalous and defamatory' material, to enjoin the future publication of similar material. The defendant had been found to have circulated charges of misconduct against public officers, and an injunction had been issued under which it was 'clear that the renewal of the publication of such charges would constitute a contempt.' 283 U.S. at 712, 51 S.Ct. at 629. The Court held the injunction invalid, even on the assumption that the publication was of a sort that could be subjected to the sanction of subsequent civil or criminal proceedings. Plaintiffs here argue that a similarly invalid prior restraint was imposed by the Dean's determination that their conduct was violating the guidelines and his announcement that continuation of the conduct would subject them to suspension. We do not, however, read the Policy on Demonstrations as placing unbridled authority for application in the Dean of Students. The Policy states that if the demonstrators 'view the request as unreasonable, they may appeal later to the President for a ruling.' While the document could by letter drafted in this regard, as we are told is being done, we understand it to mean that, in addition to the appeal to the review board, which is limited to the issue of violation of the Dean's order, there may also be an appeal to the President on the ground that the Dean's request was unreasonable. Further, it was made plain to plaintiffs' counsel at the hearing before the review board that the University recognizes a right to appeal to the President for review of any matter involving dismissal or separation of a student. The record does not disclose whether plaintiffs took their opportunity to present their case to President Miles; but it is clear from his modification of the recommendation of the board that he considered the circumstances of the demonstration in imposing his sanction.
 
 
 30
 We thus need not consider whether the procedure would be unreasonable in the absence of this channel for subsequent review. The Policy as it stands is an appropriate response to the legitimate need for effective regulation of on-campus conduct. The vesting in the Dean of Students of authority for on-the-spot application of the guidelines permits prompt and decisive action that would be impossible from a committee that would engage in long debate. His warning that he considers a demonstration to be violating the guidelines provides an opportunity for the demonstrators to correct their conduct and avoid incurring any penalty; and his construction of the guidelines is open to reappraisal by the President at a later time when excitement has waned. Finally we see nothing unreasonable in what the Dean of Students did here. Assuming as we do that the campus outside the CC buildings was sufficiently 'public' that Alfred could not deny the CC students some opportunity to demonstrate, the protesters here had been given ample chance to make their point. The demonstration was violating guideline (6) and was threatening to violate guideline (5) as well. The fact that the demonstration was much less violent than other unhappy incidents of the recent past does not mean it had not passed the limits that Alfred was required to tolerate; the ROTC cadets and the parents had rights too. While the plaintiffs construe the Dean's remark, 'Please conform to the guidelines by removing yourselves from the field,' as a command to stop the demonstration altogether, we think it meant just what it said; the students were free to withdraw from the field and continue to display their signs, as many did. They were free also to resume their marching elsewhere after the ROTC exercises were completed. Even with respect to a public park 'the principles of the First Amendment are not to be treated as a promise that everyone with opinions or beliefs to express may gather around him at any public place and at any time a group for discussion or instruction,' Poulos v. New Hampshire, 345 U.S. 395, 405, 73 S.Ct. 760, 766, 97 L.Ed. 1105 (1953). London does not make all of Hyde Park available for speechifying. What applies to a public park would be true a fortiori of the grounds of a state university, see Zanders v. Louisiana State Board of Education, 281 F.Supp. 747 (W.D.La.1968); Barker v. Hardway, 283 F.Supp. 228 (S.D.W.Va.1968), and a multo fortiori of the campus of a private one even though the Dean was acting as the State's representative vis-a-vis the CC students.
 
 
 31
 The judgment is modified so that the dismissal of the complaint with respect to the CC students is on the merits rather than for lack of federal jurisdiction. As so modified it is affirmed. In view of the novelty and importance of the issue, we shall relieve the plaintiffs of costs.
 
 APPENDIX A
 ALFRED UNIVERSITY POLICY ON DEMONSTRATIONS
 Effective January 1, 1968
 
 32
 The University cherishes the right of individual students or student groups to dissent and to demonstrate, provided such demonstrations do not disrupt normal campus activities, or infringe on the rights of others. In fact, the University is proud that some students care enough about world issues that they feel compelled in conscience publicly to proclaim their views.
 
 
 33
 On the other hand, the University cannot condone student or faculty groups which, under the banner of free speech, proceed to violate the freedom of speech, choice, assembly, or movement of other individuals or groups. In short, responsible dissent carries with it a sensitivity for the civil rights of others, and a recognition that other students have a right to dissent from the dissenters.
 
 
 34
 Accordingly, the University will in any given instance take whatever steps it deems necessary to (1) protect the right of any group to demonstrate and publicly proclaim any lawful view, however unpopular; (2) protect the freedom of speech, assembly, and movement of any group which is the object of demonstrations.
 
 
 35
 To achieve the foregoing ends, demonstrating groups will be expected to adhere to the following guidelines: (1) reasonable access to and exit from any office or building must be maintained; (2) physical harassment and verbal abuse are to be avoided; (3) demonstrators must keep at a sufficient distance to assure reasonable privacy for the student jobseeker who wishes to discuss his personal career plans with a recruiter; (4) demonstrators must aviod crowding so close to the object of protest that breach of the peace is risked or encouraged; (5) demonstrators must not attempt to force the cancellation of an event sponsored by a University office or by a faculty or student group; (6) care must be taken to avoid disrupting classes or other educational activities; (7) where an invited speaker is the object of protest, students and faculty may demonstrate outside the building where the lecture will take place. Demonstrators who wish to enter the building must do so as members of the audience; as such, they must leave all signs outside and must give the speaker a respectful hearing; (8) groups who wish to demonstrate must inform the Dean of Students' Office, 48 hours in advance, of the locale of the demonstration and the object of intended protest. Leaders of intended demonstrations are free to confer in advance with Dean of Students' staff, in order to minimize the possibility of breaking the stated guidelines.
 
 
 36
 In the instance of any given demonstration, the judgment as to whether the guidelines are being observed will be made on the spot by the Dean of Students or his designate, not by the demonstrators or by those being demonstrated against.
 
 
 37
 If at the time of the actual demonstration the Dean of Students or his designate judges that the above guidelines are being breached, he will courteously request the demonstrators to bring their procedures into accord with the guidelines. Under such circumstances, demonstrators will be expected to comply immediately. (If they view the request as unreasonable, they may appeal later to the President for a ruling.) Should the demonstrators decline to follow the Dean's request, they will be immediately suspended pending a group hearing within twenty-four hours. The review board for this hearing will consist of one member of the Dean of Students' staff (not the dean who suspended the students), one academic dean, the faculty chairman of the Student Life Committee, the chairman of the University Faculty Council, and the president of the Student Senate. The chairman of the Student Life Committee will serve as chairman of the review board. At the judgment of the chairman, the proceedings may be limited to one hour. Both the review board and the suspended students may bring to the hearing a maximum of three witnesses and/or advisers. The only relevant issue at this hearing will be: Did the suspended students follow or decline to follow the dean's request that they modify their demonstration procedures? If the hearing upholds the suspension, the students involved will be separated forthwith. Similar procedures will apply to faculty who decline to follow the stated guidelines.
 
 
 38
 Police will not be called onto the campus unless there is clear danger to life 0r to property, or unless non-Alfred University groups disrupt University operations and fail to comply with the stated guidelines when requested.
 
 Leland Miles President
 
 
 [1]
 See Professor Lewis' interesting article, Burton v. Wilmington Parking Authority-- A Case without Precedent, 61 Colum.L.Rec. 1458 (1961)
 
 
 [2]
 For those unfamiliar with New York's education system, an explanation of nomenclature may be useful. There has long been in existence the 'University of the State of New York,' Education Law 201. This is a university without walls; the term is used to include all secondary and higher educational institutions incorporated in the state and subject to general regulation by the Board of Regents and the Commissioner of Education, Education Law 202 & 214. Not until 1948 did New York establish a State University in the ordinary sense. Some theretofore private institutions were taken over, the statutory or contract colleges were included, and new public colleges were founded. Education Law 352(3)
 
 
 [3]
 These provisions, including some minor amendments. are:
 6101. College continued; jurisdiction and control
 The New York State College of Ceramics at Alfred University, established as the state school of clay-working and ceramics at Alfred university by chapter three hundred eighty-three of the laws of nineteen hundred, is hereby continued under the jurisdiction and control of the state university trustees, subject to the provisions of this article. 6102. Administration
 Such college shall continue to be administered, as to the establishment of courses of study, the creation of departments and positions, the determination of the number and salaries of members of the faculty and other employees, the apportionment and employment thereof, the maintenance of discipline and as to all matters pertaining to its educational policies, activities and operations, including research work, by Alfred university, as the representative of the state university trustees. All property and equipment acquired for the use of such college shall be the property of the state. Alfred university shall regulate tuition fees at such college after prior consultation with the state university trustees. As the representative of the state university trustees, Alfred university shall also fix the other fees and charges to be paid by the students of the college.
 All moneys received for tuition from students, those derived from the sale of products of property belonging to the state administered by the college, and from fees and charges, or any other sources in the course of the administration of the college, notwithstanding the provisions of section one hundred twenty-one of the state finance law, shall be credited to a separate fund and shall be expended for the current expenses of such college and for its benefits in such way as Alfred university, as the representative of the state university trustees, may determine. The amounts so received and expended shall be reported annually to the state comptroller. 6103. Appropriations and expenditures
 The state university trustees shall maintain general supervision over the requests for appropriations, budgets, estimates and expenditures of such college. All moneys received from state appropriations or derived from other sources in the course of the administration of such college shall be expended upon vouchers approved by the chancellor of the state university, as the chief administrative officer of the state university, or by such authority or authorities in the state university as shall be designated by the chancellor by a rule or written direction filed with the comptroller, when and in the manner authorized by the state university trustees.
 
 
 [4]
 Respondents properly called our attention to a point relating to the chronology of the steps taken below which, although highly technical, might hve deprived us of appellate jurisdiction. The opinion of the district judge was filed on September 25, 1968; notice of appeal was filed on September 30; but judgment was not entered until October 1, 1968, and no further notice of appeal was filed. See United States v. F & M Schaefer Brewing Co., 356 U.S. 227, 78 S.Ct. 674, 2 L.Ed.2d 721 (1958); In re Forstner Chain Corp., 177 F.2d 572 (1 Cir. 1949); United States v. Collins, 300 F.2d 821 (1 Cir. 1962). Without deciding the difficult procedural question, we suggested to appellants' counsel that, since the appeal had been expedited, they could still take advantage of thethird paragraph of FRAP 4(a). This allows the district judge to extend the time for filing a notice of appeal for a period not to exceed 30 days from the expiration of the time otherwise prescribed upon a showing of excusable neglect-- the latter no longer being limited, as it was until 1966, to a neglect arising from failure to learn of the entry of judgment. The judge granted such an extension on November 26, 1968, and a new notice of appeal was filed the same day. It would seem desirable that FRAP 4(a) be amended by addition of a provision similar to the second sentence of FRAP 4(b) with respect to criminal appeals so as to avoid such problems in the future
 
 
 [5]
 In light of all this we scarcely need mention that the case presents no problem of a state encouraging the formation and functioning of 'private' schools in order to evade constitutional requirements with respect to public ones. See Griffin v. County School Board of Prince Edward County, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964); Louisiana Education Comm'n v. Poindexter, 393 U.S. 17, 89 S.Ct. 48, 21 L.Ed.2d 16 (1968), 37 L.W. 3131; South Carolina State Board of Education v. Brown, 393 U.S. 222, 89 S.Ct. 449, 21 L.Ed.2d 391 (1968)
 
 
 [6]
 The Pollak case may rest also on the nearly exclusive character of the transit company's franchise. See 343 U.S. at 454 n. 1, 72 S.Ct. 96. Cf. Boman v. Birmingham Transit Co., 280 F.2d 531 (5 Cir. 1960)
 
 
 [7]
 This is not confined to the statute book. The most recent New York Legislative Manual (1967) provides, under the heading 'State University of New York': 'Origin and History-- The State University of New York was established by the State Legislature in 1948, and on April 1, 1949, the University's Board of Trustees assumed jurisdiction over the 29 existing state-supported institutions of higher education, including five temporary Institutes of Applied Arts and Sciences, 11 Teacher's Colleges, several Specialized Colleges, and six Agricultural and Technical Institutes.' p. 643. 'Composition of the University-- The State University of New York * * * comprises 67 colleges and centers * * * (including) seven Specialized Colleges * * *.' p. 642. Among the 'Specialized Colleges' are included the 'five 'contract' schools at which the administration is shared with private universities. The State University Colleges of Agriculture, Home Economics, Industrial and Labor Relations and Veterinary Medicine are at Cornell University. The College of Ceramics is at Alfred University.' p. 644. The contract colleges are included without special treatment in the list of campuses of of the state university and in the totals of students and faculty. pp. 645-46. The World Almanac lists Alfred University as being under 'state and private' control. Cornell is similarly listed, but Columbia, for example, is denominated as wholly private
 
 
 [8]
 Until 1961 CC students who were residents of New York paid no tuition. Now their tuition is $400 as against $600 for nonresidents. The liberal arts students pay substantially more. The differential is necessarily met by the State