**Barbara COLEMAN, by her parent Annie Mae Coleman, et al., Appellants,**

**v.**

**WAGNER COLLEGE, Arthur Ole Davidson, individually and as President of Wagner College, Harold Haas, individually and as Dean of the College of Wagner College, and William E. Maher, individually and as Dean of Students of Wagner College, Appellees.**

No. 858, Docket 34869.

United States Court of Appeals, Second Circuit.

Argued May 14, 1970.

Decided June 22, 1970.

Jonathan Shapiro, New York City (Margaret Burnham and Jack Greenberg, New York City, on the brief), for appellants.

Michael J. Saltser, New York City (Robert S. Bernstein, Martin L. Edelman, Edward L. Peck and Battle, Fowler, Stokes & Kheel, New York City, on the brief), for appellees.

Before FRIENDLY and KAUFMAN, Circuit Judges, and McLEAN, District Judge.*

IRVING R. KAUFMAN, Circuit Judge:

This case presents an interesting variation on the familiar theme of state action. A not uncommon method of establishing the presence of state action is to show that a private organization has undertaken to perform functions peculiarly "public" in nature and traditionally entrusted to the state. When a state acquiesces in the governing of a town by a private company or permits a political party to control a primary election, it may expect to be held responsible for the acts of those performing state functions. See Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946); Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944); Developments in the Law—Academic Freedom, 81 Harv. L. Rev. 1045, 1060–61 (1968) (public function theory applied to education). The approach to state action pressed upon us in this case is the converse of the public function doctrine. The state has intervened in the performance of a function traditionally entrusted to private organizations, the maintenance of internal order by private universities. By so doing, we are told, it has subjected the imposition of disciplinary sanctions by private colleges and universities to scrutiny under the fourteenth amendment.

Having put the question presented to us in perspective, we now distill the following factual account from the complaint, affidavits and testimony at a hearing held to determine whether an order to show cause and a temporary restraining order should be issued. The basic outline follows countless similar scenarios enacted on college campuses across the country. In April 1970, the twenty-four plaintiffs were students at Wagner College, a privately supported college affiliated with the Lutheran Church and located on Staten Island in New York City. All were members of "Black Concern," a campus organization devoted to furthering the interests of blacks and other ethnic group students at Wagner. The incident which occasioned their expulsion commenced shortly before noon on April 23, when

---

* Of the Southern District of New York, sitting by designation.

a group of students including the plaintiffs visited the office of Dean Haas, Dean of the College, for the purpose of arranging a meeting with Wagner's President, Dr. Davidson. Dean Haas made an effort to communicate with Dr. Davidson but was unsuccessful. At no time while they were present in his office, the students tell us, was Dean Haas physically restrained, nor did he request that they depart or threaten disciplinary measures.

Other members of the college's staff, however, seem to have viewed the students' presence in Dean Haas's office in a different light. Dean of Students Maher, who apparently had primary responsibility for student discipline, requested the plaintiffs to vacate the office, and at 12:45 p.m. they were warned that unless they did so within ten minutes they would be suspended. The students, nevertheless, failed to leave Dean Haas's office. At 4:00 p.m. Dean Maher stated in writing that all students in the office were suspended for the remainder of the year; that Dean Haas's detention by the students would be referred to the police if he were not freed immediately; and that the students would be expelled if they did not leave the office within an hour.

Dean Haas testified that Maher's statement was passed in to the office together with a copy of the rules and regulations for the maintenance of public order adopted by the college following the enactment of New York State Education Law, McKinney's Consol. Laws, c. 16, section 6450.[1] This section required every college in the State of New York to file with the regents and the commissioner of education "rules and regulations for the maintenance of public order on college campuses." And "[t]he penalties for violations of such rules and regulations [were to] be clearly set forth therein" and could include "suspension, expulsion or other appropriate disciplinary action" for student violators. Colleges which failed to file such rules and regulations lost their eligibility for state aid to education.

Despite Dean Maher's warning, the plaintiffs refused to leave Dean Haas's office. We are also told that Dean Haas remained until 7:15 p.m., and before his departure, allegedly granted the students permission to utilize the office for a meeting with their attorneys. This meeting was concluded at about 10:00 p.m., and the students then left the office.

The College, thereafter, proceeded to carry out its ultimatum. On April 25,

---

1. Sec. 6450. Regulation by colleges of conduct on campuses and other college property used for educational purposes.

§ 6450. Regulation by colleges of conduct on campuses and other college property used for educational purposes.

1. The trustees or other governing board of every college chartered by the regents or incorporated by special act of the legislature shall adopt rules and regulations for the maintenance of public order on college campuses and other college property used for educational purposes and provide a program for the enforcement thereof. Such rules and regulations shall govern the conduct of students, faculty and other staff as well as visitors and other licensees and invitees on such campuses and property. The penalties for violations of such rules and regulations shall be clearly set forth therein and shall include provisions for the ejection of a violator from such campus and property, and in case of a student or faculty violator his suspension, expulsion or other appropriate disciplinary action. Such rules and regulations shall be filed with the regents and the commissioner of education not later than ninety days after the effective date of this act. All amendments to such rules and regulations shall be filed with the regents and the commissioner of education not later than ten days after their adoption.

2. If the trustees or other governing board of a college fails to file the rules and regulations within the time required by this section such college shall not be eligible to receive any state aid or assistance until such rules and regulations are duly filed.

3. Nothing contained in this section is intended nor shall it be construed to limit or restrict the freedom of speech nor [sic] peaceful assembly.

the twenty-four plaintiffs and three other students who had been present in the office received notices of expulsion. The notices did not specify the college rule the students were alleged to have violated, though they did set forth the procedures for an appeal to the Faculty Counsel. The students were required to leave the Wagner campus by 5:00 p.m. April 27, a deadline prior to the time the Faculty Counsel could hear their appeals.

After failing to convince the College to stay the order requiring them to depart from the campus, twenty-four of the expelled students brought this action in the Eastern District of New York. The students alleged that the procedures employed by the college in issuing the expulsion orders did not comport with the requirements of due process. Moreover, based upon allegations of college hostility toward black students and its failure to expel white students who had engaged in similar demonstrations, the expulsions were claimed to have been in violation of the equal protection clause of the fourteenth amendment. The complaint sought injunctive relief ordering the college to reinstate the students pending a hearing, to conform its hearing procedures to the requirements of due process, and to refrain from racially discriminatory expulsions. After a hearing which appears to have been restricted to the question of state responsibility for the imposition of disciplinary sanctions by Wagner College, the district court declined to issue an order to show cause and a temporary restraining or-

der and, *sua sponte*, dismissed the complaint for want of jurisdiction.[2]

On appeal, the students do not urge that all of the actions of the administrative staff of Wagner College, an institution affiliated with a religious denomination and supported almost entirely by private funds, are actions of the state. Perhaps this is so because we rejected a similar contention in Powe v. Miles, 407 F.2d 73 (2d Cir. 1968). Instead, the appellants seize upon Judge Friendly's dictum in *Powe* that "[s]tate action would be * * * present [in a case involving campus demonstrations] if New York had undertaken to set policy for the control of demonstrations in all private universities."[3] 407 F.2d at 81. By enacting section 6450, they argue, the state legislature did undertake to set policy for dealing with campus demonstrations and, in fact, became involved with the regulation of the very activity by which the plaintiffs claim to have been unjustly injured—the imposition of disciplinary sanctions for offenses against the public order on college campuses.

The appellants' interesting argument is not without some support. In several instances, public regulation of private organizations has been adjudged a basis for a finding of state action. The Supreme Court has determined that a privately-owned and publicly-regulated transit company's practice of broadcasting radio programs on its buses and trolleys was susceptible to challenge as a "state" action. Public Utilities Commission of District of Columbia v. Pol-

2. At the time of the hearing on the order to show cause and the application for a temporary restraining order, the defendants had not been served with plaintiffs' papers and, consequently, had not moved to dismiss the complaint.

3. *Powe* arose from the disruption of an ROTC military review at Alfred University by a group of students opposed to the Vietnam War. Among the myriad theories of state action advanced by the plaintiffs in that case was a contention that the state's detailed regulation of educational standards at Alfred and oth-

er private universities made enforcement of discipline against protesters by these institutions state action. Judge Friendly observed in response to this contention that for state action to arise from public regulation, the injury incurred must result from the activity regulated. This necessary correlation was absent in *Powe* since state regulation concerned only educational standards. It would have been present, Judge Friendly noted in the dictum upon which the appellants pitch their argument, had there been meaningful regulation of campus discipline.

lak, 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 (1952). The Public Utilities Commission of the District of Columbia, the regulatory agency involved in *Pollak*, licensed and closely supervised Capital Transit's service. The Commission had, in fact, granted specific approval to the challenged practice. Similarly, a political party required to perform certain significant duties by law and to conform its internal organization to statutory standards was not permitted to evade the fourteenth amendment's proscription of racial segregation in the conduct of primary elections.[4] Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757 (1944).

But, this case differs in material respects from the cited cases. Neither the New York legislature, the regents, nor the commissioner of education ever granted approval to the particular conduct sought to be challenged, as had the Public Utilities Commission in Pollak. See Developments in the Law— Academic Freedom, 81 Harv. L. Rev. 1045, 1058 (1968). Nor, in our view, was Wagner College's expulsion of twenty-four students for participation in a campus demonstration as closely tied to traditional governmental functions as was the conduct of primary elections by the Democratic party of Texas in Smith v. Allwright. Moreover, it appears to us that the "regulation" of college discipline embodied in section 6450 appears almost devoid of meaningful content. Colleges are not required to secure approval of rules and regulations drafted pursuant to the section but merely to file them with the designated officials. The statute does not proscribe specific activities or types of conduct as violations of the public order of the campus. No penalty is designated; although college officials are required to have the sanction of ejection (and, in the case of students

and faculty members, an "appropriate disciplinary action") at their disposal, they are not required to use it. One wonders whether rules and regulations consisting solely of the statement that any individual guilty of a transgression against the public order of the campus shall be required to give the Dean of the College a rose and a peppercorn on Midsummer's Day would satisfy the literal command of the statute in all respects. Read in this manner, the statute does little more than call upon the college administrators to reconsider the problem of student discipline and to place the results of this reconsideration on record with certain officials of the State of New York. If the statute is applied in accordance with its literal meaning, regulations filed pursuant to its provisions and disciplinary proceedings instituted pursuant to these regulations are the product and responsibility of private individuals and not of the state.

We are, however, cognizant of the possibility that the statute may have been intended, or may be applied, to mean more than it purports to say. More specifically, section 6450 may be intended or applied as a command to the colleges of the state to adopt a new, more severe attitude toward campus disruption and to impose harsh sanctions on unruly students. The Governor's Memorandum approving section 6450 referred to an "intolerable situation on the Cornell University Campus" and spoke of "the urgent need for *adequate* plans for student-university relations." 2 McKinney's 1969 Session Law, p. 2546 (emphasis added). Several other bills pending in the New York legislature while section 6450 was under consideration suggest that the statute was enacted in an atmosphere of hostility toward unruly student demonstrators and of resolve to make disruption costly for

---

4. The private organization found to have acted as the arm of the state in Smith v. Allwright was the Democratic party of Texas. Texas law required the party to certify candidates for general elections, enabled citizens to compel the performance of this duty by writ of mandamus, required the party to establish precinct, district and state committees, and prescribed the manner of their establishment. 321 U.S. at 662–663, 64 S.Ct. 757.

the participants.[5] If these considerations have merit and section 6450 was intended to coerce colleges to adopt disciplinary codes embodying a "hard-line" attitude toward student protesters, it would appear that New York has indeed "undertaken to set policy for the control of demonstrations in all private universities" and should be held responsible for the implementation of this policy. Powe v. Miles, 407 F.2d 73, 81 (1968). Since we cannot resolve this question on the record before us, we conclude that the district court acted too hastily in dismissing the complaint and, consequently, remand for a further hearing at which the plaintiffs may introduce evidence to establish that section 6450 represents a meaningful state intrusion into the disciplinary policies of private colleges and universities.

Of the factors to be explored on remand, several would seem of particular importance.[6] Most significant are the actions of the state officials with whom the rules and regulations are to be filed. If these officials were to regard their function as more than a ministerial task, and, as an illustration, believed themselves empowered to prevent regulations from being filed because of substantive "inadequacies," or exercised any other influence upon the content of regulations filed pursuant to section 6450, they would provide strong indicia of state action. Less obvious in its significance is the attitude of the college administrators required to draft regulations by the statute. We would ordinarily be loath to suggest that state action can arise from a private individual's mistaken notion that his acts have the imprimatur of the state. Cf. Griffin v. Maryland, 378 U.S. 130, 135, 84 S.Ct. 1770, 12 L.Ed.2d 754 (1963) ("If an individual *is possessed of state authority and purports to act under that authority,* his action is state action") (emphasis added). A reasonable and widespread belief among college administrators, however, that section 6450 required them to adopt a particular stance toward campus demonstrators would seem to justify a conclusion that the state intended for them to pursue that course of action. And this intent, if present, would provide a basis for a finding of state action. We discern several possible means of determining the attitude of college administrators toward the effect of the statute. The universal adoption of noticeably more stringent standards governing student disruption following the statute's enactment or an attempt by administrators to attribute the imposition of harsh penalties to the command of the state would give support to the contention that the statute constitutes significant state intervention in the area of campus discipline.

Reversed and remanded for proceedings consistent with this opinion.

---

5. The Governor vetoed bills which would have made the disruption of college classes or activities a criminal offense (S. 5302; A. 6794) and rendered a student convicted of a crime arising out of campus disruption ineligible for government scholarships (S. 524; A. 1684). New York Times, May 30, 1969, p. 28, col. 5. Other bills introduced in the New York State Senate (S. 4629; S. 4235) would have allowed the commissioner of education to intervene directly in the control of campus disruption. The consideration of these statutory alternatives to section 6450 by the New York state legislature does not entirely support plaintiffs' interpretation of the section. That the legislature chose to enact section 6450 in preference to bills which provided for direct state intervention in campus disruption, may, on the contrary, indicate an intent to rely upon continued private control.

6. Although the plaintiffs' third claim for relief sounds in contract, on remand we see no need to explore any possible jurisdictional basis other than state action, for presumably there is no diversity between all plaintiffs and all defendants. For a discussion of the contract theory of the relationship between students and educational institutions, see Developments in the Law—Academic Freedom, 81 Harv. L.Rev. 1045, 1145–1147 (1968).

FRIENDLY, Circuit Judge (concurring):

I fully agree that the district court erred in dismissing the complaint for want of jurisdiction. However, although I recognize that the question of state action here is a close one and that resolution in plaintiffs' favor would not be compelled by the dictum in Powe v. Miles, 407 F.2d 73, 81 (2 Cir. 1968), even if that were binding, I would uphold their claim in that respect and would remand for consideration on the merits rather than for the elaborate preliminary inquiry which my brothers direct.

Until 1969 New York was content to leave the control of conduct on the campuses of private colleges to private colleges, save as all this might be governed by New York's general law of crime, tort and contract. We held in Powe v. Miles, *supra,* 407 F.2d at 79–82, that so long as New York thus stood aside, the enforcement of discipline by a private college was not state action despite New York's unusually extensive regulation of educational standards and the grant of state aid. Not satisfied with that situation, the 1969 Legislature moved in, as it had every right to do. It directed the governing boards of all colleges to "adopt rules and regulations for the maintenance of public order on college campuses and other college property used for educational purposes and provide a program for the enforcement thereof." The colleges were further ordered to set forth in these regulations the penalties for violation, which "shall include provisions for" "suspension, expulsion or other appropriate disciplinary action." Henceforth, it can thus be forcefully argued, a private college in promulgating rules and regulations for the maintenance of order on the campus is exercising a power emanating from the legislature even though it could have acted on its own, as many in fact had done.[1] This, as it seems to me, is the teaching of Judge Tuttle's well-known opinion in Boman v. Birmingham Transit Co., 280 F.2d 531 (5 Cir. 1960), although the plaintiffs' case there was strengthened by the quick succession of repeal of a city ordinance and the promulgation of a Transit Company regulation, both requiring seating on the basis of race, and by the company's need of a franchise to use the city streets.[2]

Two sets of considerations weigh with me in favor of a decision that the state action line has here been crossed, irrespective of what the inquiry directed by the majority may reveal.

Plainly one objective of the New York legislation was to deter student disturbances by the clear announcement of rules of conduct and of the penalties for disobedience. That is fair enough; indeed it is a principal justification for our system of criminal sanctions. But if the state wishes the benefits of such deterrence in private colleges, must it not accept responsibility for preventing overdeterrence by excessive sanctions and lack of fair procedure for enforcement? Furthermore, and perhaps still more important, do not rules of private colleges framed in response to a state mandate have a significantly different symbolic appearance than rules formulated in the absence of such a statute? It is pertinent that the Rules and Regulations of Wagner College here at issue begin with a statement that a committee had met to prepare them "in accordance with the newly enacted New York Public Law 129–a, which required such a document," then set out § 6450 of the Education Law in full text, and include a copy of the required report to the Department of Education. The circulation of such a document fits rath-

---

1. See O'Neil, Private Universities and Public Law, 19 Buffalo L.Rev. 155, 185 (1970), forecasting the very problem that has here arisen and advocating an affirmative answer to the question of state action.

2. But see, as to the uncritical character of the latter, Public Utilities Comm'n of District of Columbia v. Pollak, 343 U.S. 451, 462, 72 S.Ct. 813, 96 L.Ed. 1068 (1952).

er precisely the sentence from Griffin v. Maryland, 378 U.S. 130, 135, 84 S.Ct. 1770, 12 L.Ed.2d 754 (1964), that my brother Kaufman quotes. Furthermore, objections to the very existence of a detailed code would be met by the answer that one was state-compelled. When a state has gone so far in directing private action that citizens may reasonably believe this to have been taken at the state's instance, state action may legitimately be found even though the state left the private actors almost complete freedom of choice.

That, as it seems to me, must be the rationale of Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). Although the Authority had not directed the Eagle Coffee Shoppe to discriminate against blacks, it had placed the Shoppe in a position in which citizens could reasonably view the restaurant's acts as authorized by an agency of the state. Here, as in that case, "the State has so far insinuated itself into a position of interdependence * * * that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth Amendment," 365 U.S. at 725, 81 S.Ct. at 862. It is arguable—indeed, I have argued [3]—that racial discrimination is so peculiarly offensive and was so much the prime target of the Fourteenth Amendment that a lesser degree of involvement may constitute "state action" with respect to it than would be required in other contexts—a consideration that might also serve to distinguish the *Birmingham Transit* case if a distinction were desired.[4] But the ordinary citizen must find it puzzling enough that there is a constitutional limit on the regulation of student conduct at Buffalo and Stony Brook but none at Columbia and Cornell that courts should not be averse to recognizing state action with respect to

the latter when New York has departed, even in a rather minor way, from the hands-off policy it followed until 1969.

In maintaining that the complaint should be decided on the merits, I would not wish to be understood as intimating any view what the decision should be. As held in Powe v. Miles, *supra,* 407 F.2d at 83–85, neither the First Amendment nor the due process clause of the Fourteenth prevents reasonable regulation of student protests by educational institutions, including summary suspension when that is deemed necessary to prevent a situation from getting out of hand. See generally C. Wright, The Constitution on the Campus, 22 Vand. L. Rev. 1027 (1969), and Judge Blackmun's fine opinion in Esteban v. Central Missouri State College, 415 F.2d 1077, 1088–1090 (8 Cir. 1969).

---

3. Friendly, The Dartmouth College Case and the Public-Private Penumbra 26 (1968).

4. See C. Black, "State Action," Equal Protection, and California's Proposition 14, 81 Harv.L.Rev. 69 (1967).