Richard **ROBINSON**, Appellant,

v.

Grier **DAVIS** et al., Appellees.

No. 14531.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 8, 1970.

Decided Sept. 8, 1971.

Butzner, Circuit Judge, dissented
and filed opinion.

George S. Daly, Jr., Charlotte, N. C.
(Norman B. Smith, Greensboro, N. C.,
on the brief), for appellant.

Ann H. Phillips, Asheville, N. C.
(Robert R. Williams, Jr., and Williams,

Morris & Golding, Asheville, N. C., on the brief), for appellees.

Before BOREMAN, BRYAN and BUTZNER, Circuit Judges.

BOREMAN, Circuit Judge:

This appeal by a student [1] at Montreat-Anderson College, from the dismissal of a complaint brought pursuant to the Civil Rights Act, 42 U.S.C. § 1983, and 28 U.S.C.A. §§ 2201 and 2202, requires analysis of the concept of "state action." Mr. Justice Clark observed in Burton v. Wilmington Parking Authority, 365 U.S. 715, 722, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), that the invocation of this constitutional precept against the deprivation of certain constitutional rights of an individual, by means of "state action," depended upon the existence of appropriate facts and circumstances. Only by an assessment of the facts and by a balancing of the incident circumstances of the particular case, can we determine the significance of any non-obvious involvement of the State in private conduct.

### I

Montreat-Anderson (hereafter "College"), a junior college with a student body of approximately 480, is a private educational institution owned and operated by the Presbyterian Church of the South (hereafter "Church"). The College and the Mountain Retreat Association (the latter hereafter "Association"), also wholly owned by the Church, are located upon a tract of land, once owned solely by the Church, at the foot of the Black Mountain Range, northwest of the town of Black Mountain, North Carolina. Both the College and the Association, separable legal entities, hold title to the land upon which they are located. Over the years the Church has sold from the original tract numerous lots to its members and others for summer residences and to the faculty and staff of the College and the Association for permanent homes. In 1967 the North Carolina General Assembly passed an Act making this entire area a municipal corporation and designating it as the town of Montreat (hereinafter "Town").

Since a high percentage of the property in the Town is tax exempt insufficient monies are available to fund the usual municipal services; consequently the Town has a contract with the Association pursuant to which the latter organization provides these municipal services. As partial recompense the Town pays 95 percent of its small tax levy to the Association. The Town has no paid employees; it does have an unsalaried Board of Commissioners which functions as an administrative body.

Various defendants, whose roles in this case are involved, occupy the following positions:

Grier Davis—President of the College and of the Association;

William L. Schwantes, Sr.—Business Manager of the College, the Association and the Town, Security Officer for the College and for the Association, and Chief of Police of the Town;

Peter Post—Security Officer for the College and for the Association, a Policeman for the Town, and a laborer for the College and for the Association;

Jack Wood—a Student of and Security Officer for the College, and a Policeman for the Town;

Chris Maney—a Student of the College, a Security Officer for the College and for the Association, and a Police Officer for the Town;

Morry Stanton—a Student of the College, a Security Officer for the College and for the Association, and a Police Officer for the Town.

### II

In recent years there has been a proliferation in the usage of drugs by

---

1. Originally this action was initiated by two plaintiffs, Richard Robinson and one Leon Rippy, as a class action on behalf of other students at Montreat-Anderson College. Rippy was subsequently dismissed as a party.

students at the College. Accordingly the Student Handbook of the College for the year 1969–1970 contained a regulation [2] specifically designed to meet this disquieting development.

During the fall of 1970, an agent of the State Bureau of Investigation conferred with College Security Officer Peter Post, and informed him unequivocally that a number of students of the College were engaged in the use and sale of narcotic drugs. Post subsequently relayed this information to Donald Mitchell, Dean of the College. The ensuing investigation resulted in the promulgation by the Administrative Committee of the College of another regulation [3] admonishing students against the use of drugs. The College's Honor Court, comprised mainly of students and normally having jurisdiction of violations of the drug regulations, abdicated this responsibility in favor of the Administrative Committee.[4] From information supplied by the State Bureau of Investigation and several confidential informants as to the names (the plaintiff being named among them) of students engaged in using, buying and selling drugs on the campus, it was manifest to Dean Mitchell and Mr. Post that the extent of drug usage at the College was alarming. Consequently, Dean Mitchell called a meeting of the Administrative Committee for the night of January 14, 1970, for a more extensive probe into the drug activities on the College campus.

A list of students to be called before the Administrative Committee during this meeting was compiled by Dean Mitchell and Security Officer Post.

This list contained the names of those students reportedly involved in the use and exchange of drugs on the campus and those students who could conceivably furnish additional information to the college authorities concerning the drug problem. Plaintiff, Robinson, who reputedly had been selling drugs to other students at the College, was named on this list. Each of the College Security Officers Jack Wood, Chris Maney and Morry Stanton was given a sub-list and requested to notify the students named thereon to appear before the Administrative Committee.

Security officers were instructed to ask the students to appear in a certain classroom in Gaither Hall, a college facility, to confer with the Administrative Committee; these officers were further directed to merely request that the students appear, giving the time and place of the hearing, instructing students to bring books or reading material for use while they awaited appearance before the Committee; that, in the event any student refused to come, such refusal was to be reported to the Dean of the College. Some of the students on the list received notification of the meeting from students other than those acting as security officers.

The record clearly reflects the adherence of the security officers to their instructions. No mention of arrest was made and the students were permitted to visit their dormitory rooms to secure books or other articles of personal property for use during the time they might be waiting to appear before the Committee. The security officers were at-

---

2. "Narcotics (Action by Honor Court)
 Use or possession of illegal drugs on the campus is a serious violation of college regulations; persons accused of violation of this regulation will be tried by the Honor Court."

3. "Drug Policy
 Students who possess, consume, or sell any drug, on or off campus, are in serious violation of College regulations. Such persons will be tried by the Honor Court. Action taken will range from rehabilitation consultation to expulsion."

4. When the drug problem on the College campus became acute, the Honor Court adopted the following resolution:
 "In view of the seriousness of the traffic in drugs the court would be grateful if it could, when necessary or advisable, refer cases to the Administrative Committee, and from time to time confer with individual members of the Administrative Committee."

tired in Town of Montreat police uniforms, with side arms, furnished by the Town. It appears from the record that the security officers normally wear the same uniform whether acting as town policemen or as security officers.

Two classrooms in Gaither Hall were used for the meeting, one of which was occupied by the Administrative Committee and was designated as a hearing room; the other was utilized as a waiting room for the students. Mr. Charles Wilson, Director of Athletics for the College, and Mrs. Thomas Crumpler, Nurse for the College, were in charge of the waiting room. Some of the students asked if they could leave prior to appearing before the Committee; they were advised that they were free to do so, but that such action would be reported to the Dean and that it might conceivably result in disciplinary action against them. Defendants Post and Schwantes assisted the Administrative Committee in questioning the students and Wood, Maney and Stanton assisted in supervising the students in the waiting room during the hearing. Student defendants, Bob Blair, President of the Student Government, Jerry McDade, Vice-President of the Honor Court, Donald White, President of the Inter-Dormitory Council, and Lee Gaunt, Secretary of the Honor Court, sat with the Administrative Committee on the evening of January 14.

The evidence reveals that the plaintiff, Robinson, was questioned for approximately twenty minutes in the hearing room. Neither he, nor any other student has been arrested or indicted as a result of the hearing or the circumstances surrounding it. Subsequent to the meeting of the Administrative Com-

mittee, twelve students were disciplined by the College, six of whom, Robinson among them, were not asked to return for the second semester. The term "not asked to return" does not mean expelled; only those who were invited at the end of a semester could, according to custom, return for the following semester.

## III

Robinson and one Leon Rippy originally initiated this suit as a class action on behalf of numerous students at the College.[5] Alleging violation of the Civil Rights Act, 42 U.S.C. § 1983, they invoked the court's jurisdiction under 28 U.S.C. §§ 2201 and 1343(3). Three forms of relief were sought: (1) a declaratory judgment that the disputed actions of the college officials were illegal since they were under color of state law; (2) a permanent injunction against repetition of such actions with respect to the plaintiffs and members of the class; and, (3) monetary damages. The action was tried by the district judge.[6] He concluded, in essence, that the evidence failed to show action "under color of any State law, ordinance, regulation, custom or usage" as required by 28 U.S.C. § 1343(3), and dismissed the complaint.[7]

Robinson, alone, has appealed, maintaining that the procedures used by the College to request the presence of certain students in Gaither Hall and in the subsequent hearing involved state action.

## IV

■ We perceive no sufficient basis for holding that the action of the college officials in requesting the presence of certain students at the hearing and in

5. Ten members of this class asserted, through counsel, that the plaintiffs did not have their permission to bring the action on their behalf. The district judge dismissed the action as to those ten students.

6. Counsel for the parties agreed to a consolidation of the trial of the action on the merits with the hearing on a motion by the plaintiffs for a preliminary injunc-

tion. A further hearing was to be held if it were found appropriate to award monetary damages.

7. The district judge concluded, further, that the fundamental constitutional rights of the plaintiffs had not been violated by the defendants regardless of whether or not state action was involved.

subsequently questioning them constituted state action.

The appellant argues first, that the circumstances in the instant case reflect a significant involvement of the state similar to that in Burton v. Wilmington Parking Authority, *supra,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). This argument is predicated on the premise that the Town and the College are a joint enterprise, in practical effect the same entity. Clearly, the College dominates activities in the Town. Yet the facts are that many private citizens not connected in any way with the College hold legal title to their own town residential properties. Legal title is held by the College and by the Association to the land utilized by each, respectively. The Association provides all municipal services for the Town and security officers for the College; the College pays the Association for providing the security officers; the College finances the major portion of its own service expenses. For example, the College pays Mr. Schwantes, the Business Manager for both the College and for the Association, one-half of his salary. The North Carolina General Assembly signified its recognition of the Town as a separate legal entity by designating it as a municipal corporation in 1967. As its governing body the Town has a Board of Commissioners, not connected in any significant manner with the College. It is true that some individuals work both for the College and the Town but this factor does not warrant the conclusion that the two entities are a joint enterprise. Their areas of operation and lines of authority are plainly distinguishable and separable. We find no merit in the contention that the Town and the College are a "joint enterprise."

█ Appellant predicts a disquieting result if this court fails to recognize the existence of state action in the un-usual and extraordinary circumstances here. He warns that any municipality with little regard for the Fourth Amendment could create a holding company arrangement with a private organization through artful corporate manipulation and use this means to inquire into the private affairs of its inhabitants in a manner violative of their constitutional rights. We think appellant's fears are purely speculative and totally unfounded. It has been held that a private entity functioning in a public fashion may not plead its title in order to deprive individuals of their constitutional protected rights, particularly those under the mantle of the First Amendment. Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946). *See* Amalgamated Food Employees Union Local 509 v. Logan Valley Plaza, Inc., 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968). The teaching of the cases in this area is clear, obviating the necessity for further discussion.

In the instant circumstances we cannot discern the pervading presence of state action as the Court did in Burton v. Wilmington Parking Authority, *supra,* and as the Fifth Circuit did in Derrington v. Plummer, 240 F.2d 922 (5 Cir. 1956), cert. denied sub nom. Casey v. Plummer, 353 U.S. 924, 77 S.Ct. 680, 1 L.Ed.2d 719 (1957). In those cases there was a positive and inseparable involvement of state action and facilities with the private agency; the state had so involved itself in a position of interdependence with the private party that it had to be recognized as a joint participant in the challenged activity.[8] At best, the State in this case has a far from positive connection with the College; the Association, not the College, provides municipal services for the Town and some officials of both the College and the Association carry out some of those services. The elements of control over, involvement in and direct responsi-

8. In the *Burton* case there was a lease by and between the State and the private party, the restaurant. The Court was clearly influenced by the argument that the State could affirmatively have required the operators of the restaurant to discharge their responsibilities under the Fourteenth Amendment.

bility for the actions of the private party, present in *Burton*, are lacking here.

 Nor do we find any basis for the appellant's argument that the State, in the form of the police-security officers and other college officials who also held part-time jobs with the Town, participated directly in the challenged action in the instant case. To support this argument appellant relies on Powe v. Miles, 407 F.2d 73 (2 Cir. 1968). In *Powe* the Dean of Students of Alfred University, basically a private institution located in the State of New York, suspended certain of the plaintiffs enrolled as students in the New York State College of Ceramics, one of Alfred's four colleges, and other plaintiffs attending another of the colleges under the aegis of Alfred University.[9] Relying upon New York State's clear declaration [10] that the College of Ceramics was a state institution and the explicit statement in Education Law, McKinney's Consol.Laws, c. 16, § 6102,[11] that Alfred University shall administer the New York State College of Ceramics as the representative of the (New York) state university trustees, the Second Circuit found state action to be implicit in the steps taken by President Miles and the Dean of Students with respect to the students of the College of Ceramics. However, that court found no "state action" in the disciplinary measures taken against the students in the wholly private colleges of Alfred University. It is implicit also in the court's decision that Alfred University officials acted under color of state law in the exercise of one part and did not so act in the exercise of another part of this authority. The court in *Powe* clearly emphasized that the State must be involved with the institutional activity which caused the alleged injury to the plaintiff and not simply with some other activity unrelated to the injury. It is the appellant's contention, with which we disagree, that this point buttresses his position; he argues that policemen and other part-time officials of the Town were involved directly in the very action that caused injury to him, and that this involvement constituted state action.

The circumstances of *Powe* and the instant case are similar in that both involve officials of largely or wholly private educational institutions. The cases are, however, distinguishable. It is plain from the record in the instant case that the students, summoned by the security officers, were cognizant that those individuals were fellow students and were acting in their part-time capacities as security officers. Student members of the Inter-Dormitory Council, the Honor Court and the Student Government of the College, were present; this was a hearing by College representatives and students to investigate the distribution and use of drugs on campus. Such action is not only normal and desirable in present times but, indeed, necessary. Additionally, the testimony of the security officers and of the college of-

9. The seven students directly implicated, had violated certain rules of conduct previously announced by Alfred's president, Mr. Miles.

10. Education Law, McKinney's Consol. Laws, § 6101, quoted in pertinent part in Powe v. Miles, 407 F.2d at 75, n. 3:
 "§ 6101. College continued; jurisdiction and control
 "The New York State College of Ceramics at Alfred University, established as the state school of clay-working and ceramics at Alfred University by chapter three hundred * * *."

11. Quoted in relevant part in Powe v. Miles, *id.*:
 "§ 6102. Administration
 "Such college shall continue to be administered, as to the establishment of courses of study, the creation of departments and positions, the determination of the number and salaries of members of the faculty and other employees, the apportionment and employment thereof, the maintenance of discipline and as to all matters pertaining to its educational policies, activities and operations, including research work, by Alfred University, as the representative of the state university trustees * * *."

ficials who initiated their mission was to the effect that Wood, Stanton and Maney were acting pursuant to their instructions, not as policemen of the Town but as part-time security officers of the College.

Clearly, *Powe* itself stands for the proposition that the actions of an official in one of his capacities can constitute "state action" while his moves in another capacity cannot be so characterized or construed. A strong underpinning for this view is provided by the holding in Watkins v. Oaklawn Jockey Club, 183 F.2d 440 (8 Cir. 1950). That court cited [12] United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941), for the proposition that "Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law," 313 U.S. at 326, 61 S.Ct. at 1043. It further extracted [13] from the decision in Screws v. United States, 325 U.S. 91, 111, 65 S.Ct. 1031, 1040, 89 L.Ed. 1495 (1945), the statement that "It is clear that under 'color' of law means under 'pretense' of law. Thus acts of officers in the ambit of their personal pursuits are plainly excluded."

■ Defendants in the instant case were not performing any duty imposed upon them by state law nor did they make any "pretense" that they were acting under state law; they were working for the College. While the defendants Wood, Maney and Stanton in the case at bar wore their garb of policemen they had been instructed not to make any arrests. The Eighth Circuit in *Watkins, supra,* held that the sheriff and deputy sheriff although officially garbed, were working for the race track at the time of the incident in question and did not act under color of state law. Wood, Maney and Stanton were also acting within the ambit of their private employment and duties as part-time security officers for the College; clearly, they were participating in a normal and necessary administrative function of the College. It is plain that a state officer is not necessarily acting in his official capacity merely because he is clothed in official garb, as we are taught by *Watkins. See also* Griffin v. Maryland, 378 U.S. 130, 84 S.Ct. 1770, 12 L.Ed.2d 754 (1964).[14] We find no "state action" in the incidents complained of by the appellant.

Our decision as to the absence of state action is dispositive of the case; consequently we do not reach the other issues presented on appeal.

Affirmed.

BUTZNER, Circuit Judge (dissenting).

Because of the fusion of church and state this record discloses, I would require Montreat-Anderson College to comply with the due process clause of the fourteenth amendment.

The Mountain Retreat Association, a corporation wholly owned by the Presbyterian Church, performs all of the municipal services of the incorporated town of Montreat, North Carolina. In turn, the town pays the association ninety-five per cent of all taxes it collects. Viewed realistically, the association and the town are inseparable. The evidence also reveals that administration of the college is interwoven with the governance of the association and the town. The college, too, is wholly owned by the church. Its president and

12. 183 F.2d at 443.

13. 183 F.2d at 443.

14. The petitioners in *Griffin* had been ordered to leave a privately owned and operated park by a park employee who was also a deputy sheriff and was wearing his badge at the time of the incident in question. Clearly, the Court premised its finding of "state action" upon the deputy sheriff's actions and not his garb; he acted as a deputy sheriff and placed the petitioners under official arrest. The deputy wore an indicium of his office, his badge, but that factor was not the one upon which the Court rested its decision.

business manager are also the president and business manager of the association. The business manager serves in a similar capacity for the town as well as its chief of police. The entire police force of the town is jointly employed by the college or the association. It is hired, fired, and paid by corporations wholly owned by the church.

The case, I believe, is governed by Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), because the town, an agency of the state, in the language of Mr. Justice Clark, "has so far insinuated itself into a position of interdependence" with the college and the association "that it must be recognized as a joint participant" in the narcotics investigation which led to this suit. On this account the investigation "cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth Amendment." 365 U.S. at 725, 81 S.Ct. at 862.

To escape the onus of state action, the college protests that the students were not arrested and that they never will be indicted.[1] Undoubtedly, the college is in a position to give these assurances because its responsible officials are also the officials of the association which administers the affairs of the town. Their domination is illustrated by the testimony of Peter Post, a college security officer, association security officer, and town policeman, who took an active part in the investigation. He obtained information from the State Bureau of Investigation about the narcotics traffic at the college, received incriminating intelligence from confidential informants, compiled the list of suspects who were to be called before the investigating committee, supervised the summoning of students, attended the inquest, and participated in the interrogation. Post, claiming that he acted throughout the investigation as a college security officer, testified that had he been acting as a town policeman, he would have had to arrest some of the students. Other than the control the college exercises over town police, the record furnishes no explanation why Post did not secure state warrants for the arrest of students who violated state laws in his jurisdiction. Reluctantly I conclude the record depicts a town governed not by law, but by men, and—despite the prohibition of the first amendment—churchmen.

I do not quarrel with the aim of the college to eliminate narcotics traffic on its campus. But the end does not always justify the means. When college officials vest themselves with the cloak of municipal authority, they act not only as private citizens, but also as agents of the state. Accordingly, they should act with due regard for the fourteenth amendment. Due process requires at least that students at state colleges be given notice of the charge, information about the nature of the evidence against them, an opportunity to be heard in their own defense, and that evidence be substantial to justify punishment. Esteban v. Central Missouri State College, 415 F.2d 1077, 1089 (8th Cir. 1969); Dixon v. Alabama State Board of Education, 294 F.2d 150, 158 (5th Cir. 1961); see Wright, The Constitution on the Campus, 22 Vand.L.Rev. 1027, 1071 (1969); Developments in the Law—Academic Freedom, 81 Harv.L.Rev. 1045, 1138 (1968).

There can be no doubt that the students at Montreat-Anderson College were denied these minimal rights. Summoned peremptorily at the supper hour to an inquest that lasted until four o'clock the next morning,[2] the students were not given notice of the charges against them.

1. The district court found: "No student has been indicted as a result of the entire investigation and no indictment is contemplated by the College or anyone else connected with the investigation."

2. The students were questioned individually and then permitted to depart. Pending their appearances, however, they were assembled in an anteroom and prevented from leaving even momentarily unless accompanied by a guard.

They were interrogated, but were given scant opportunity to know of the evidence against them and to present evidence in their own behalf.

I would reverse and remand for entry of a decree requiring the college to expunge the record of its inquisition and to offer reinstatement to the plaintiff and other students similarly situated. The decree should also provide that reinstatement is subject to the right of the college to expel the students if, after a rehearing conducted with the same regard for procedural due process required of state colleges, there appears substantial evidence that they had violated college regulations.