**Kenneth C. ROSSIGNOL, et al.**

v.

**Richard VOORHAAR, et al.**

**No. CIV.A.WMN–99–3302.**

United States District Court,
D. Maryland.

Feb. 21, 2002.

---

Seth D. Berlin, Levine Sullivan & Koch, LLP, Washington, DC, Alice Neff Lucan, Law Office, Washington, DC, for Plaintiffs.

John F. Breads, Jr., Local Government Insurance Trust, Columbia, MD, Kevin Bock Karpinski, Allen Karpinski Bryant and Karp PA, Baltimore, MD, for Defendants.

## MEMORANDUM

NICKERSON, District Judge.

Before the Court are: Plaintiffs' Motion for Summary Judgment on Liability Issues (Paper No. 69); Cross–Motion for Summary Judgment filed by Defendants Doolan, Long, Merican, Myers, Willenborg, and Young (Paper No. 73); Defendant Fritz's Cross–Motion for Summary Judgment (Paper No. 74); Cross–Motion for Summary Judgment filed by Defendants Voorhaar, Alioto, and Board of County Commissioners for St. Mary's County ("the County") (Paper No. 75).[1] The motions have been exhaustively briefed and are ripe for decision. Upon review of the pleadings and applicable case law, the Court determines that no hearing is necessary (Local Rule 105.6) and that: all Defendants will be granted summary judgment as to Counts 1–3, which assert causes of action under 42 U.S.C. § 1983, and the remaining state law claims (Counts 4–6) will be dismissed for lack of jurisdiction.

## I. FACTUAL BACKGROUND

The facts of this unusual case are, for the most part, undisputed. Plaintiff is the publisher of a weekly community newspaper called *St. Mary's Today*. Defendants include St. Mary's County Sheriff Richard Voorhaar, seven members of the Sheriff's Department,[2] St. Mary's County State's Attorney Richard Fritz, and the county

1. Defendants Doolan, Long, Merican, Myers, Willenborg, and Young also filed a motion for leave to file their reply memorandum in excess of the page limit (Paper No. 78). The motion will be granted.

2. The Sheriff's Department Defendants, and their ranks as of November 2, 1998, are as follows: Steven Doolan (Captain); Edward Willenborg (Corporal, Narcotics Section); Michael Merican (Sergeant, Internal Affairs Division); Lyle Long (Sergeant, Criminal Investigations Unit); Steven Myers (Deputy First Class); Harold Young (Deputy First Class); and Daniel Alioto (Deputy First Class).

Board of Commissioners. Late on the night of November 2, 1998, and in the early morning hours of November 3, a large number of *St. Mary's Today* newspapers were purchased *en masse* by several of the Sheriff's Department Defendants, among other people, just hours before the local election, in which Defendants Voorhaar and Fritz were candidates. Before describing the events of that night, however, the Court will provide some background information about the parties.

In 1990, Plaintiff Kenneth Rossignol began publishing *St. Mary's Today*, a weekly community newspaper serving St. Mary's County and two adjoining counties.[3] In the autumn of 1998, Plaintiff printed [4] approximately 6,500 copies per issue, most of which were sold in St. Mary's County. According to Plaintiff, about 2,600 newspapers were sold in retail stores in St. Mary's County, and about 1,100 were sold from newsboxes. The remaining newspapers were sold either to subscribers or at locations outside of St. Mary's County. Each issue of *St. Mary's Today* sold for 75 cents.

There is no question that articles appearing in St. Mary's Today have tended to generate a great deal of controversy. The paper often took a sharply critical stance toward public officials, including members of the St. Mary's County Sheriff's Department and the State's Attorney. According to Plaintiff, the paper's brand of journalism is "hard-hitting and not-infrequently controversial." Pl.'s Brief at 4. Defendants, however, refer to the paper as "unsavory," "scathing," and "outright lies." *See, e.g.*, Merican Response to Interrogatory 1; Willenborg Dep. at 37–39; Fritz Dep. at 33.

Defendants have described in particular how they were portrayed by the newspaper. According to Defendant Fritz, the paper had referred to Defendant Doolan as a "drunk," and Defendant Long as a "child abuser" and a "lazy" officer. *See,* Fritz Dep. at 126–28. Defendant Willenborg claims that St. Mary's Today prints lies about his family, see Willenborg Dep at 37–39, 222; Defendant Merican recalled being referred to as a "shoeshine boy," as well as other insults. *See,* Merican Dep. at 27–30. Defendant Voorhaar reports that the paper has "written a lot of things about me for a long period of time," and that eventually he stopped reading *St. Mary's Today*. *See,* Voorhaar Dep. at 21. Plaintiff does not dispute this testimony, although he points out that at times *St. Mary's Today* has printed favorable coverage of the Sheriff's office. *See* Pl.'s Brief at 7.

Tuesday, November 3, 1998 was election day in St. Mary's County. Running for office that day were, among others, Sheriff Voorhaar, who was running for re-election as Sheriff, and Richard Fritz, who was running for State's Attorney for St. Mary's County. It was also the day that *St. Mary's Today* was scheduled to come out with its weekly issue. About a week before election day, some of the Sheriff's Department Defendants began to construct a plan to buy up a large number of St. Mary's Today papers on the night before the election, when the papers were scheduled to be delivered to stores and newsboxes. Defendant Willenborg was

---

**3.** Rossignol publishes the paper through the Island Publishing Company, which is also named as a plaintiff in this action. Rossignol notes that he brought suit on behalf of the company in order to avoid argument that the proper party had not instituted the action. Defendants assert that Island Publishing is not a proper party. The disposition of this case in favor of Defendants, however, effectively moots the issue. In light of this, for the purposes of this memorandum, the Court will ignore the presence of Island Publishing Company as a plaintiff.

**4.** Plaintiff contracted with the *Washington Times* to print the newspapers.

the first to come up with the idea. Shortly thereafter, Defendants Long, Merican, and Doolan agreed to participate in the plan. Defendant Willenborg has also testified that there was "passing conversation" about the plan with people at work, as people were "passing in the hallway." Willenborg Dep. at 211. Sheriff Voorhaar, who did not participate in the mass purchase, has stated that he knew about the plan about a week before election day, and had communicated his support for the idea.[5] See, Voorhaar Dep. at 112.

There is little dispute about the planning of the mass purchase. Defendant Willenborg mentioned the idea to two civilians after a Fritz campaign meeting at Fritz's house. The civilians agreed to participate in the purchase, and suggested that they meet at the home of one of the civilians on the Sunday prior to the election, to plan which stores each would visit to make the purchases. Present at that meeting were Defendants Willenborg, Doolan, Merican, and Alioto, who were all off-duty, along with several civilians. Participants agreed that the members of the Sheriff's Department should "not wear anything that resembled the police," see Doolan Dep. at 65, and that they should drive private vehicles. Furthermore, they agreed to obtain receipts for the store-bought papers, and to videotape the newsbox purchases to document the fact that they had paid for each paper. See, e.g., Merican Dep. at 43. Defendants also testify that they agreed that if any store clerks refused to sell the papers, they would simply leave and not buy them. See, Merican Dep. at 42; Doolan Dep. at 115. Also at the meeting, Defendant Willenborg handed out a list of the

locations of newsboxes and stores selling St. Mary's Today, which had been compiled by Defendant Long when he "drove around St. Mary's County one night checking places that sold St. Mary's Today." See, Willenborg Dep. at 199–200.

To fund the mass purchase, Defendants collected money from various sources. Sheriff Voorhaar contributed $500. Voorhaar Dep. at 41. Defendant Doolan gave $75. Doolan Dep. at 89. Defendant Fritz contributed $500, although he testified that he was merely passing along a contribution from his brother. Fritz Dep. at 47. One local resident contributed $2,500; others contributed smaller amounts. See, Willenborg Dep. at 146–48. Plaintiff has neither argued nor submitted evidence that the contributions came from any campaign or public funds.

At approximately 11:00 p.m. on November 2, 1998, Defendants Doolan, Merican, Young, Long, Myers, Willenborg, and Fritz met at Defendant Long's home. All six Sheriff's deputies were off-duty throughout the night.[6] Stickers depicting a copy of St. Mary's Today going into a trash can were handed out, and some of the defendants wore them throughout the night.[7] See, e.g. Willenborg Dep. at 71. At this meeting, some Defendants expressed concerns about the legality of their plan and asked Defendant Fritz for his opinion. Defendant Fritz suggested that they obtain receipts for their purchases, but otherwise advised the others that he believed Defendants had a right to purchase as many papers as they desired. See, Doolan Dep. at 270; Fritz Dep. at 17. After Defendant Fritz was dropped off at home, the other Defendants divided into

---

**5.** Sheriff Voorhaar did independently purchase some copies of St. Mary's Today on the night before the election, but the number is disputed. See, Voorhaar Dep. at 58 (stating he bought four copies); Doolan Dep. at 192 (stating that Voorhaar had told him he bought 15 to 20 copies).

**6.** One Defendant in this case, Deputy Alioto, was on duty that night, but did not accompany other Defendants on their purchases.

**7.** The stickers were designed and produced by a civilian who is not a party to this lawsuit.

two groups to carry out the purchases (Merican, Doolan, and Young; and Willenborg, Long, and Myers).

As planned, Defendants collected receipts from stores and videotaped themselves buying papers from newsboxes. At about 2:00 a.m., as Plaintiff was attempting to repair a jammed newsbox, he noticed that many of his newsboxes were empty. Plaintiff then began to drive around trying to replenish the supply of *St. Mary's Today* in various locations. Defendants saw Plaintiff's vehicle and began following him, purchasing many of the papers that Plaintiff had attempted to restock. *See*, Willenborg Dep. at 58. The purchases continued throughout the night, until about 7:00 a.m. on the morning of November 3, 1998.[8]

Plaintiff alleges that Defendants bought 1,379 newspapers during the night. *See*, Def. Doolan, *et al.* Reply at Exh. 19 (Plaintiff's listing of papers "seized"). Defendants do not dispute this calculation. Plaintiff also claims, however, that approximately 300 papers were taken without payment from various stores that were not yet open for business when Defendants arrived. *See*, Pl.'s Brief at Exh. 11, 14 (Pl.'s responses to interrogatories). Defendants deny that any papers were taken without payment. It is undisputed, however, that the papers in Defendants' possession on the morning of November 3, 1998, were bundled and placed in a barn on property owned, at least in part, by Defendant Fritz's family.

On the videotape of the newsboxes purchases, as well as in testimony prepared

for this lawsuit, Defendants have expressed their purposes for executing the mass purchase of *St. Mary's Today*. Many Defendants state that they participated in the mass purchase because they had expected that the election day edition of *St. Mary's Today* would print something highly critical of Defendant Fritz, who was running for the office of State's Attorney and whom many Defendants supported. *See, e.g.*, Doolan Dep. at 50 ("[I]t is my opinion that ...[Plaintiff was] out to slander Mr. Fritz to keep him from becoming the State's Attorney"); Voorhaar Response to Interrogatory, Pl.'s Brief at Exh. 19 (stating that he expected Plaintiff to "smear" Fritz, "thereby depriving him of an opportunity to defend himself prior to the election").[9] At least one Defendant also suspected the paper would publish a negative story about Sheriff Voorhaar, who was running for re-election. *See*, Willenborg Dep. at 219. Several Defendants also described the mass purchase as a "protest," or as an attempt to anger or "one up" Plaintiff. *See, e.g.*, Doolan Response to Interrogatories (Def.'s Exh. 10); Merican Dep. at 32, 99; Long Response to Interrogatories (Pl.'s Exh. 16).

Defendants' predictions that the election day edition of *St. Mary's Today* would run negative stories about Fritz and Voorhaar were realized. In large font, the front-page headline declared, "Fritz Guilty of Rape." The article reported that in 1965, Defendant Fritz had pleaded guilty to carnal knowledge of a minor-a conviction which Fritz does not deny.[10] Another *St.*

---

8. Later that day, both Defendant Voorhaar and Defendant Fritz won election to their respective offices.

9. Not long before the 1998 election, Plaintiff began operating an "on line" version of *St. Mary's Today,* which apparently previewed the forthcoming print edition. Defendants deny that they saw the website prior to the election, but instead based their predictions of

the paper's content on their "experience with previous *St. Mary's Today* election editions." *See, e.g.,* Doolan Dep. at 50–51.

10. The conviction had already been made public by another newspaper four years earlier, when Fritz had also run (unsuccessfully) for State's Attorney.

*Mary's Today* election day article, entitled "Woman Supervisor Ordered Him to Have Sex, Says Cop," criticized Sheriff Voorhaar's handling of an alleged sexual harassment complaint.

In 1999, Plaintiff filed a six count Complaint in this Court. Counts 1–3 are brought pursuant to 42 U.S.C. § 1983 and assert violations of Plaintiff's First Amendment rights (Count 1), Fourth Amendment rights (Count 2), and Fourteenth Amendment right to due process (Count 3). Count 4 alleges violations of corresponding rights guaranteed by the Maryland Declaration of Rights (Count 4). The Complaint also alleges the common law violations of tortious interference with business relations (Count 5) and civil conspiracy (Count 6). Plaintiff has moved for summary judgment as to liability on all counts. Defendants have also moved for summary judgment as to all counts.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A party seeking summary judgment bears the initial responsibility of informing the court of the basis of its motion and identifying the portions of the opposing party's case which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party is entitled to have "all reasonable inferences ... drawn in its respective favor." *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1129 (4th Cir. 1987).

If the movant demonstrates that there is no genuine issue of material fact and that the movant is entitled to summary judgment as a matter of law, the non-moving party must, in order to withstand the motion for summary judgment, produce sufficient evidence in the form of depositions, affidavits or other documentation which demonstrates that a triable issue of fact exists for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. Unsupported speculation is insufficient to defeat a motion for summary judgment. *Felty*, 818 F.2d at 1128 (citing *Ash v. United Parcel Serv., Inc.*, 800 F.2d 409, 411–12 (4th Cir.1986)).

When both parties file motions for summary judgment, the court applies the same standards of review. *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir.1991); *ITCO Corp. v. Michelin Tire Corp.*, 722 F.2d 42, 45 n. 3 (4th Cir.1983) ("The court is not permitted to resolve genuine issues of material facts on a motion for summary judgment—even where ... both parties have filed cross motions for summary judgment") (emphasis omitted), *cert. denied*, 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985). The role of the court is to "rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard." *Towne Mgmt. Corp. v. Hartford Acc. and Indem. Co.*, 627 F.Supp. 170, 172 (D.Md.1985) (quoting Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil* 2d § 2720 (2d ed.1993)). *See also Federal Sav. and Loan Ins. Corp. v. Heidrick*, 774 F.Supp. 352, 356 (D.Md.1991). "[C]ross-motions for summary judgment do not automatically empower the court to dispense with the determination whether questions of material fact exist." *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 349 (7th Cir.1983), *cert. denied*, 464 U.S. 805, 104 S.Ct. 53, 78 L.Ed.2d 72 (1983). "Rather, the court must evaluate each par-

ty's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987). Both motions may be denied. *See Shook v. United States,* 713 F.2d 662, 665 (11th Cir.1983).

### III. DISCUSSION

To prevail in an action under 42 U.S.C. § 1983, a plaintiff must demonstrate that defendants acted "under color of state law" to deprive the plaintiff of a right secured by the Constitution or laws of the United States. *See, West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). An individual acts under color of state law when exercising or misusing power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *United States v. Classic,* 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941). A state employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law. *See, Parratt v. Taylor,* 451 U.S. 527, 535–36, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). *See also Monroe v. Pape,* 365 U.S. 167, 172, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), *overruled on other grounds by Monell v. Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

In contrast, the "[a]cts of police officers in the ambit of their personal, private pursuits fall outside of 42 U.S.C. § 1983." *Revene v. Charles County Commissioners,* 882 F.2d 870, 872 (4th Cir. 1989) (citations omitted). A state officer's private conduct, no matter how wrongful, is not actionable under § 1983. *See, Barna v. Perth Amboy,* 42 F.3d 809, 816 (3rd Cir.1994) (stating that "a police officer's purely private acts which are not furthered

by any actual or purported state authority are not acts under color of state law.").

When determining whether a defendant acted under color of state law, "the nature of the act performed is controlling." *Revene,* 882 F.2d at 872 (*citing Monroe v. Pape* at 184–87, 81 S.Ct. 473). Whether or not the defendant officers were on duty, wearing a uniform, driving a patrol car, or exhibiting other indicia of state authority, may inform the inquiry but is not dispositive of the issue. *See, Robinson v. Davis,* 447 F.2d 753, 759 (4th Cir. 1971). Rather, the reviewing court must examine the nature and circumstances of the defendant's conduct to determine whether it is "fairly attributable to the state." *Revene* at 872 (*citing Rendell–Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982)).

In support of his motion for summary judgment, Plaintiff first argues that the Defendants who actually purchased the newspapers (hereinafter, "the Purchasing Defendants") acted under color of state law because of the close "nexus" between the speech they sought to suppress and their conduct as public officials. In other words, Plaintiff contends that the Purchasing Defendants' conduct was directly related to their performance of official duties, because it was allegedly carried out in retaliation for Plaintiff's outspoken criticism of that performance.

Plaintiff's argument misses the mark for two reasons. First, it does not apply to those Purchasing Defendants whose expressed purpose was not to retaliate for Plaintiff's critique of their job performance, but rather to minimize negative press about Candidate Fritz on the day of the election. More importantly, Plaintiff's argument misapplies the law as it relates to § 1983's "under color of state law" requirement. In emphasizing the "nexus" between Defendants' conduct and their po-

sitions as state officials, Plaintiff relies upon cases in which the defendants were private citizens, not state officials, and the inquiry was whether their actions could be treated as those of the State itself. *See, e.g., Mentavlos v. Anderson,* 249 F.3d 301, 310 (4th Cir.2001), *cert. denied,* —— U.S. ——, 122 S.Ct. 349, 151 L.Ed.2d 264 (2001); *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n,* 531 U.S. 288, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001). Here, however, the Purchasing Defendants are unquestionably state officials, and the inquiry is whether "the actions complained of were committed while the defendants were purporting to act under the authority vested in them by the state, or were otherwise made possible because of the privileges of their employment." *Hughes v. Halifax County School Board,* 855 F.2d 183, 186–87 (4th Cir.1988); *see also United States v. Classic,* 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941) (enunciating traditional "under color of state law" standard).

The fact that Defendants' conduct was related to or motivated by their state employment does not transform that conduct into state action under the standards set forth above. Cases cited by Plaintiff to support the proposition that it does are distinguishable, because in each of those cases the defendant was found to have

acted under color of state law, *independently* of his or her motive for acting.[11] *See, e.g., United States v. Causey,* 185 F.3d 407, 415–16 (5th Cir.1999), *cert. denied,* 530 U.S. 1277, 120 S.Ct. 2747, 147 L.Ed.2d 1010 (2000) (where defendant police officer participated in the murder of a woman who had filed a complaint against him, defendant's "status as a police officer put him in the unique position to 'handle the thirty' [police code for murder] and thus offer protection to [the murderer] from the consequences of the murder"); *Dang Vang v. Vang Xiong X. Toyed,* 944 F.2d 476 (9th Cir.1991) (finding that jury reasonably could have concluded that defendant used his government position to exert influence and physical control over plaintiffs in order to sexually assault them); *ACLU v. Wicomico County,* 999 F.2d 780 (4th Cir. 1993) (prison officials acted under color of state law in barring plaintiff from visiting inmates to document their complaints).[12]

Perhaps recognizing the weakness of his first argument, Plaintiff later submitted to the Court additional factual evidence that allegedly demonstrates that the Purchasing Defendants used their official authority to carry out their plan.[13] Viewed in the light most favorable to Plaintiff, these additional facts include the following: (1) at least two of the Purchasing Defendants

**11.** In making his argument, Plaintiff relies heavily on *Coming Up v. San Francisco,* 857 F.Supp. 711 (N.D.Cal.1994), which held that, where the police chief ordered officers to confiscate copies of free newspaper that criticized his conduct, and officers did so while on duty and driving a police vehicle, the police chief and officers were precluded from obtaining qualified immunity at summary judgment. The case is distinguishable on its facts and does not provide authoritative guidance for this Court.

**12.** Plaintiff also falters when he relies on the seminal case *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) to support his position. That decision, which

held that a public official may not recover damages for defamatory statements without showing actual malice, in no way stands for the proposition, as Plaintiff would have it, that "a government official's suppression of [speech that is critical of his conduct] necessarily bears a sufficiently close nexus to his role as a public official and performance of his duties to warrant the imposition of liability under Section 1983." Pl.'s Brief at 37–38.

**13.** Plaintiff explains that he does not rely on these additional facts in support of his own motion for summary judgment, but rather contends that they preclude the entry of summary judgment for Defendants.

carried their service weapons during the night; (2) Defendant Merican wore a Fraternal Order of Police sweatshirt, which a store clerk recognized as bearing a police symbol; (3) Defendants Willenborg and Long used Sheriff's office pagers; (4) many of the store clerks recognized Defendants as law enforcement officers from previous contacts; (5) one store clerk was intimidated by Defendants into selling them his supply of the papers; (6) one customer was prevented from buying a copy of *St. Mary's Today* and recognized Defendants as police officers. *See,* Pl.'s Separate Statement of Additional Facts, Paper No. 76, and attachments thereto.

The officers' firearms, if visible, certainly convey state authority. So does a police symbol on an item of clothing. Plaintiff, however, provides no evidence that these indicia of authority had the effect of intimidating or coercing store clerks into selling newspapers they otherwise would not sell.[14] *Cf. Robinson v. Davis,* 447 F.2d at 759 (observing that outward indicia of authority-or lack thereof-are not dispositive in the "under color of state law" inquiry). The customer deposed by Plaintiff testified that he was not allowed to purchase the newspaper because Defendant Merican leaned on the stack of papers he (Defendant Merican) was purchasing and said, "they're already sold." Hester Dep. at 10. Although the customer was able to deduce that Defendant Merican was a police officer, there is no evidence that Defendant Merican used his authority as such to prevent the customer from making his purchase.

The one clerk who testified to being intimidated by Defendants, Justin Van Patten, admitted that his fears stemmed from his history of run-ins with law enforcement (though not with the Defendants who bought the papers from him) and his criminal record. *See,* Van Patten Dep. at 13, 45–46. Van Patten recognized Defendants as Sheriff's deputies when they entered the store, in part because he had "seen them around in the uniforms" and because he recognized the Maryland police symbol on the sweatshirt of one Defendant. *See,* Van Patten Dep. at 18. Nowhere in his testimony, however, does Van Patten indicate that Defendants displayed their weapons, identified themselves as Sheriff's deputies, invoked their authority as such, or used their law enforcement powers to obtain the newspapers. The Court concludes that the subjective feelings of this one witness, without evidence that Defendants purported to exercise their police authority over him, are not sufficient to preclude summary judgment for the Purchasing Defendants.[15]

Having concluded that Defendants Willenborg, Doolan, Long, Young, Myers, and Merican are entitled to summary judgment on the § 1983 claims, the Court now turns to the ramifications of this conclusion for other Defendants. First, Plaintiffs claim that Defendant Fritz, who was a private citizen at the time of the mass purchase of *St. Mary's Today,* should be liable as a joint actor or co-conspirator with the Purchasing Defendants. *See, Street v. Surdyka,* 492 F.2d 368, 374 (4th Cir.1974) (ob-

---

**14.** Plaintiff also fails to provide evidence that the office pagers enabled Defendants to carry out their purchases. Even if they communicated with them during the night, Defendants had already planned their endeavor using the lists of newspaper locations, and had divided into groups to complete the purchases.

**15.** Plaintiff also asserts that store clerk Beverly Burnett was pressured or coerced into selling all her copies of St. Mary's Today. *See,* Pl.'s Supp. Facts at 4. Ms. Burnett's deposition, however, reflects that she did not identify the customer as a law enforcement officer, nor did she feel intimidated into selling the papers, nor did the customer become angry or rude with her. Burnett Dep. at 27–29.

serving that "[e]ven private citizens can take on the color of state law when they participate in police action"). Since this Court has found that the mass purchase constituted private conduct not executed under color of state law, there was no "police action" with which Defendant Fritz could have participated. Therefore, he too is entitled to summary judgment on the § 1983 claims.

■ Under the same reasoning, Defendant Voorhaar cannot be held liable as a joint actor, co-conspirator, or supervisor of the Purchasing Defendants. Nor can he be found independently liable under § 1983. The evidence of Sheriff Voorhaar's involvement -namely, that he contributed money, communicated his approval of the plan, and personally bought several newspapers on the morning of the election- does nothing to demonstrate that he acted under color of state law. There is no evidence that Sheriff Voorhaar directed or ordered Defendants to carry out the mass purchase, nor that he had reason to believe it constituted state action. Rather, the Sheriff contributed to and supported the private pursuits of his deputies.[16]

■ Defendant Alioto is also entitled to summary judgment. Defendant Alioto was on patrol duty the night of November 2, 1998, but did not accompany the Purchasing Defendants as they bought the papers. Defendant Alioto met with Defendant Long in a parking lot at one point during the night to discuss an ongoing automobile theft investigation. *See*, Willenborg Dep. at 82, 86; Alioto Dep. at 37–41. Plaintiff has offered his speculation that, during the night in question, he heard Defendant Alioto make numerous radio calls, allegedly assisting the Purchasing Defendants with logistics. *See*, Rossignol Dep. at 102. Defendant Alioto has countered with his testimony that his radio calls were that of a "normal" evening on patrol, *see* Alioto Dep. at 32–36, and with the testimony of other Defendants, stating that they did not have access to Sheriff's radio transmissions from the private vehicles they used to make the purchases. *See*, Willenborg Dep. at 189. Based on these facts, Plaintiff simply has not offered sufficient evidence to preclude entry of summary judgment in favor of Defendant Alioto.

■ Finally, having disposed of all of Plaintiff's federal claims, the Court finds that it has no independent basis for jurisdiction over Plaintiff's pendant state claims. Therefore, Counts 4–6 of the Complaint will be dismissed for lack of subject matter jurisdiction. *See*, 28 U.S.C. § 1367. In so doing, the Court does not intend to suggest that Plaintiff's state law claims cannot withstand a similar motion if brought in a state proceeding.

## IV. CONCLUSION

For the foregoing reasons, the Court will grant summary judgment to all Defendants as to Counts 1–3 of the Complaint. Counts 4–6 will be dismissed without prejudice. A separate order consistent with this memorandum will issue.

---

16. For the same reasons, the Sheriff was not acting as a policy maker when he approved of and contributed to the mass purchase. Therefore, Plaintiff's claim of § 1983 municipal liability against St. Mary's County must fail, as it relied on allegations that Defendant Voorhaar, as the "final policy maker" for the Sheriff's office, "not only ratified the unconstitutional seizure of the [papers], but he actively conspired and acted with the other de- fendants to carry it out." Pl.'s Brief at 40. Since there was no unconstitutional conduct, the Board of Commissioners for St. Mary's County will be granted summary judgment as to the claims against it. Having so decided, the Court need not reach the issue of whether, as Plaintiff argues, Defendants acted pursuant to a longstanding custom, practice, or policy of violating Plaintiff's First Amendment rights.

## ORDER

Pursuant to the foregoing memorandum, and for the reasons stated therein, IT IS this day of February, 2002, by the United States District Court for the District of Maryland, hereby ORDERED:

1. That Defendants Doolan, Long, Merican, Myers, Willenborg, and Young's Motion For Leave to File Reply Memorandum in Excess of Page Limit (Paper No. 78) is hereby GRANTED;

2. That Plaintiff's Motion for Summary Judgment on Liability Issues (Paper No. 69) is hereby DENIED;

3. That Defendants Doolan, Long, Merican, Myers, Willenborg, and Young's Motion for Summary Judgment (Paper No. 73) is hereby GRANTED as to Counts 1–3;

4. That Defendant Fritz's Motion for Summary Judgment (Paper No. 74) is hereby GRANTED as to Counts 1–3;

5. That Defendants Voorhaar, Alioto, and Board of County Commissioners for St. Mary's County's Motion for Summary Judgment (Paper No. 75) is hereby GRANTED as to Counts 1–3;

6. That Counts 4–6 of the Complaint are hereby DISMISSED without prejudice;

7. That this case is hereby CLOSED;

8. That any and all prior rulings made by this Court disposing of any claims against any parties are incorporated by reference herein and this order shall be deemed to be a final judgment within the meaning of Fed.R.Civ.P. 58; and

9. That the Clerk of the Court shall mail or transmit copies of the foregoing memorandum and this order to all counsel of record.